IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

PAUL MATUS, M.D.,              ) CASE NO.  1:13 CV 1029
                                           )
        Plaintiff,             )
                                           )
v.                                   ) JUDGE DONALD C. NUGENT
                                         )
LORAIN COUNTY GENERAL     )
HEALTH DISTRICT, ET AL.,      )
                                         ) **MEMORANDUM OPINION**
        Defendants.       )
                                         )

This matter is before the Court on Motion for Partial Summary Judgment on Liability Only filed by Plaintiff, Paul Matus, M.D. (Docket #56) and the Motion for Summary Judgment filed by Defendants, Lorain County General Health District, Kenneth G. Pearce, William Spreng, David P. Covell, and Gerald A. Innes (Docket #60).  For the reasons that follow, Plaintiff's Motion for Partial Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted in part and denied in part.

**I.  Overview.**

From 1991 to 2013, Dr. Matus was the Medical Director of the Lorain County General Health District ("Health District"). (Joint Stipulations, Doc. 58, ¶1.)  In 2009, he entered into an Employment Agreement with the Health District for an indefinite term. (Amended Complaint, Doc. 52, ¶¶8-9.)  Either party was permitted to terminate the Agreement on thirty days notice for cause.  (Employment Agreement, Doc. 58-2, p. 2.)  In August 2012, the Health District commenced a sexual harassment investigation regarding claims that were reported to then Health

Commissioner Ken Pearce regarding conduct by Dr. Matus toward a female employee months prior that made her uncomfortable.  (Matus Declaration, Doc. 56-2, ¶¶10, 13-15.)  The investigation turned up no evidence that Dr. Matus had sexually harassed the employee, or anyone else, and he was not disciplined as a result.

On the heels of the investigation, the Health District brought seven additional charges against Dr. Matus based on actions he had allegedly taken both while the investigation was ongoing and after it had concluded.  (See Doc. 60-1, pp. 174-88.)  A Pre-Disciplinary Honference was held during which Dr. Matus was represented by Counsel and evidence was presented. (Id.)  A neutral third party found no misconduct as to four of the charges, but concluded that Dr. Matus had engaged in misconduct when he (1) made "personal and derogatory attacks upon the moral character and integrity of the female staff;" (2) contacted the ex-husband of his accuser and attempting to obtain information to use against his accuser; and, (3) engaged in misconduct by refusing to turn over documents to his employer related to his alleged misconduct.  (Id.)  As a result, the Health District decided to terminate Dr. Matus's employment and he was given a thirty-day notice of his termination on April 12, 2013.

Dr. Matus filed this lawsuit on April 11, 2013 in the Lorain County Court of Common Pleas against the Health District; Ken Pearce, former Health Commissioner of Lorain County; William Spreng, a member and Vice President of the Board of Health at the Health District ("the Board"); and, Dave Covell, the current and then Deputy Health Commissioner of Lorain County.  On May 7, 2013, Defendants filed a Notice of Removal with this Court pursuant on the basis of this Court's Federal question jurisdiction.  28 U.S.C. § 1331.  Dr. Matus filed an Amended Complaint on April 2, 2014, asserting the following claims:  Count I – Breach of Employment

2

Agreement; Count II – Breach of the Duty of Good Faith and Fair Dealing; Count III - Age

Discrimination in Violation of Ohio Revised Code 4112.02(N); Count IV – Creation of Hostile

Work Environment Based on Age in Violation of Ohio Rev. Code §§ 4112.02(N); Count V –

Unlawful Retaliation in Violation of Ohio Revised Code § 4112.02(I); Count VI – Intentional

Infliction of Emotional Distress; and, Count VII – Retaliation -  First Amendment, 42  U.S.C. §

1983 and 42 U.S.C. § 1988.

Dr. Matus maintains that the allegations of sexual harassment were demonstrably false;

that he was investigated in retaliation for his opposition to then Health Commissioner Ken

Pearce's attempts to "double dip" by remaining on the Health Board payroll after his retirement;

that he was harassed due to "'generational differences' [which] may exist with the female

educators [who were interviewed during the investigation] being in their twenties and thirties

and the Medical Director being in his early sixties;" and, that he was discharged in retaliation for

participating in a hearing, proceeding and investigation where he expressed various personal

opinions about the Health District, the Health Commissioner, and the misuse and unfair

application of Health District's policies and procedures. (Amended Complaint, Doc. 52, pp. 1-2.)

Dr. Matus moves for partial summary judgment as to his claims for Breach of

Employment Agreement; Breach of Implied Duty of Good Faith and Fair Dealing; and,

Retaliation pursuant to Ohio Revised Code Section 4112.02(I).  Defendants move for summary

judgment as to all claims.

## II.  Factual Background

**A.      Health Commissioner Pearce Announces His Retirement.**

On July 25, 2009, during a regularly scheduled Meeting of the Lorain County Board of

Health ("the Board"), Defendant Ken Pearce, Health Commissioner of Lorain County,

announced his plans to retire.  (Joint Stipulations, Doc. 58, ¶13.)  There is evidence that during

this meeting there was some expression of support by certain members of the Board for Mr.

Pearce being rehired as Interim Commissioner following his retirement.  (Matus Declaration,

Doc. 56-2, ¶6.)  Other members of the Board – particularly the Board's President, Edward Von

Hofen, who is Dr. Matus's brother-in-law – were opposed to the idea because it would be

perceived as inappropriate for Mr. Pearce to retire, collect his pension, and "double dip" by

being rehired and paid by the Board of Health.  (Matus Declaration, Doc. 56-2, ¶6.)

**B.      Allegation that Dr. Matus sexually harassed a female employee.**

On August 6, 2012, after having announced his retirement, Mr. Pearce met with two

Health District Employees, Stephanie Charles and Ray Romero, to prepare a presentation.

(Pearce Depo., Doc. 60-2, p. 35.)  There is evidence that during the meeting, there was

discussion as to whether Dr. Matus would be taking over as Health Commissioner after Mr.

Pearce retired.  (Pearce. Depo., Doc. 60-2, p. 35.)   Dr. Matus asserts that he was not interested in

the job, but that Mr. Pearce, Board Vice President Spreng and other Health District employees

believed that Dr. Matus would be a viable candidate for the position. (Plaintiff's Answers and

Objections to Interrogatories, Doc. 57-1, #6.)  During the August 6, 2012 meeting, Ms. Charles

reportedly informed Mr. Pearce that she would feel uncomfortable with Dr. Matus serving as

Health Commissioner.  (Pearce Depo., p. 40; Romero Depo, pp. 15-16.)  Ms. Charles explained

4

that sixteen or seventeen months earlier – in March or April of 2011 – she was instructing Dr. Matus on use of the "Emergency Alertfind" program on a small laptop computer.  (Matus Declaration, Doc. 56-2, ¶10.)  During this tutorial, Ms. Charles claimed that she felt "very uncomfortable with Dr. Matus" because he "sat uncomfortably close to her" and had a "conversation of a personal nature." (Matus Declaration, Doc. 56-2, ¶10.)  Ms. Charles reported that there was no physical contact between her and Dr. Matus.  (Matus Declaration, Doc. 56-2, ¶10.)[1]

According to Mr. Pearce, although Ms. Charles indicated she did not want the incident reported, he felt that he had to report the incident to the Board.  (Matus Declaration, Doc. 56-2, ¶10; Pearce Depo, Doc. 60-2, pp. 41-44.)  Mr. Pearce contacted Lorain County Assistant Prosecutor Ben Davey and told him what Ms. Charles had reported.  (Matus Declaration, Doc. 56-2, ¶10; Pearce Depo., Doc. 60-1, pp. 41-44.)  Pursuant to the direction of the Prosecutor's Office, Mr. Pearce put the allegation in writing and delivered it to the Prosecutor's Office. (Pearce Depo., Doc. 60-1, p. 51.)

---

[1]

  Dr. Matus did not find out about the allegations against him until later; asserts there was no merit to them; and, as described below, an independent investigation found no evidence to support a claim of sexual harassment.  Dr. Matus asserts that he did not engage in a conversation of a personal nature with Ms. Charles; that the computer session with her lasted only a few minutes; and, that he say near enough to the computer screen to read the screen and understand the instructions. (Matus Declaration, Doc. 56-2, ¶11.)

**C.      August 15, 2012 Board Meeting: Mr. Pearce to Stay On as Interim Commissioner.**

On August 15, 2012, during an executive session of the Board, Board Members debated

Mr. Pearce's pending retirement and his possible retention as Interim Commissioner.  (Matus

Declaration, Doc. 56-2, ¶7; Joint Stipulations, Doc. 58, ¶14.)  During the meeting, Board

President Von Hofen (Dr. Matus's brother-in law) requested that Mr. Pearce and Assistant

County Prosecutor Ben Davey step out of the meeting, which they did.  (Pearce Depo, doc. 60-2,

p. 45; McCullough Depo., Doc. 59-2, pp. 11-12.)  According to Dr. Matus, neither were happy

with this request.  Board President Von Hofen then stated his opposition to rehiring Mr. Pearce

because of the apparent impropriety of allowing Mr. Pearce to "double dip."  (Matus

Declaration, Doc. 56-2, ¶7; McCullough Depo, Doc. 59-2, pp. 11-14.)  Another Board member,

Ms. McCullough, acknowledged during her deposition that Board President Von Hofen was

opposed to the idea of keeping Mr. Pearce in an interim capacity.  (McCullough Depo., Doc. 59-

2, p. 14.) Ultimately, a resolution was passed at a public meeting by which the Board approved

keeping Mr. Pearce as the Transitional Health Commissioner to take effect on October 31, 2012.

The term was to conclude upon selection of a new permanent Health Commissioner.  (Joint

Stipulations, Doc. 58, ¶14.)

**D.      Mr. Pearce Allegedly Retaliates Against Dr. Matus**.

Dr. Matus maintains that beginning on August 22, 2012, Defendant Pearce took a series

of retaliatory actions in response to Dr. Matus's and Board President Von Hofen's opposition to

his retention as Transitional Health Commissioner following his retirement.  It is undisputed that

on August 22, 2012, Dr. Matus's employment agreement was faxed from the Health District to

the County Prosecutor's Office.  (Matus Declaration, Doc. 56-2, ¶9; Doc. 58, Joint Stipulation,

6

Doc. 58,. ¶15.)  It is not evident who sent the fax.  On August 28, 2012, Mr. Pearce sent a letter

to Assistant Prosecutor Ben Davey, in which he reported the conversation that he had with Ms.

Charles on August 6, 2012 regarding her uncomfortable interaction with Dr. Matus.  (Matus

Declaration, Doc. 56-2, ¶10, Doc.. 58, Joint stipulation ¶17.)  Mr. Pearce summarized Ms.

Charles's complaint and identified "several"[2] other female employees who had complaints about

Dr. Matus.

      Dr. Matus points out that Mr. Pearce sent the letter over Ms. Charles's request that he not

do so.  Ms. Charles allegedly did not want Mr. Pearce to "respond because of her personal

relationship with another Health District staff member and due to her past history of divorce."

(Matus Declaration, Doc. 56-2, ¶ .)  Dr. Matus suggests that the fact that Mr. Pearce waited 22

days to submit a letter to Assistant Prosecutor Davey demonstrates that he was acting according

---

[2]

      Defendants state that "several" women had complained, but based on the Parties'
Joint Exhibit 16, it is apparent that there were two women.

to his plan to "clean house" by allowing the prosecutor to straighten everything out later.[3]  (Doc. 62, p. 4.)

**E.      An Investigation of the Allegations Regarding Dr. Matus is Initiated.**

On September 12, 2012, the Board held a regularly scheduled meeting, which Dr. Matus attended.  When the meeting went into executive session, Dr. Matus was asked to leave and the discussion turned to "disciplinary matters."  (Matus Declaration, Doc. 56-2, ¶13.)  The Board

---

[3]

Dr. Matus dedicates several of pages of briefing to the description of interactions between Mr. Pearce and other Health District employees, which Dr. Matus suggests provide evidence of Mr. Pearce's motive, state of mind, or intent at the time the sexual harassment investigation was being conceived.  For instance, on August 16, 2012, after he had announced his retirement, Mr. Pearce met with numerous Board of Health staff members, and he informed them that the Board meeting the day before "did not go well."  (Tonya Kollen Depo., Doc. 59-3, pp. 10-12.)  Mr. Pearce indicated that he would be returning on an interim basis in about two months, and that during that time no one was to contact Dr. Matus or legal counsel, except Tonya Kollen or Joyce Davis.  (Kollen Depo., Doc. 59-3, p. 14.)  Prior to this instruction, there were no such restrictions on who could contact Dr. Matus or legal counsel. (Kollen Depo., Doc. 59-3, p. 16.)

Mr. Pearce met with Tanas Wilcox, the Director of Nursing, on four occasions in August.  (Tanas Wilcox Depo., Doc. 59-4, pp. 25-26, 28, 30-31-33.)  Mr. Pearce informed Ms. Wilcox that he had met with Board members McCullough and Spreng and that the Board had made it Pearce's assignment "to clean house."  (Wilcox Depo., Doc. 59-4, pp. 25-26.)  Pearce suggested that her job was at risk, but that he would try to protect her. (Wilcox Depo., Doc. 59-4, pp. 25-26.)  Pearce further informed Wilcox that Dr. Matus was " going around lying about [her]" and that he was "politicking" for the Health Commissioner job.  (Wilcox Depo., Doc. 59-4, pp. 29, 32.)

Mr. Pearce advised Ms. Wilcox, "I am to take care of you, and they [the Board] will take care of Dr. Matus. And I'm going to be here for six months." (Wilcox Depo., Doc. 59-4, p. 33.) According to Ms. Wilcox, Mr. Pearce then pulled his finger across his throat in a slicing gesture.  (Wilcox Depo., Doc. 59-4, p. 33.)  Mr. Pearce reminded Ms. Wilcox that "they need to clean house," that he would make more money, and that the "prosecutor's office will straighten out everything later."  (Wilcox Depo., Doc. 59-4, p. 33.)

was then informed that an unnamed employee had made a complaint about Dr. Matus's conduct. (Spreng Depo., Doc. 59-6, pp. 37-40.)  It was recommended that an investigation be initiated and that an outside entity be hired to conduct the investigation.  (Von Hofen Depo., Doc. 59-7, pp. 55-56.)

Dr. Matus maintains that the Board approved the investigation without sufficient facts or information upon which to base its decision. (Matus Declaration, Doc. 56-2, ¶13.)  According to Dr. Matus, the complaint against him was characterized to the Board as a "very serious allegation[ ] of sexual harassment," but the Board was not presented with any specific information to support the allegations.  (Matus Declaration, Doc. 56-2, ¶13.)  The Board was not informed who made the complaint, or when or where or under what circumstances the alleged incident occurred.  In addition, there is evidence that the Board was not presented with Mr. Pearce's letter to Assistant Prosecutor Davey.  (McCullough Depo, Doc. 59-2, pp. 34-35.)  Board Member McCullough, who was present for the discussion, testified that she did not know what the allegations were other than someone complained about Dr. Matus.  (McCullough Depo., Doc. 59-2,  pp. 34-35.)  Board Vice President Spreng, who was also present, testified that the Board was led to believe that "several staff members felt uncomfortable around Dr. Matus and that he said some inappropriate things." (Spreng Depo., Doc. 59-6, pp. 40-41.)

Following the executive session, the Board passed a Resolution to hire Clemans, Nelson, and Associates, Inc. ("Clemans Nelson") to "revise and update the agency's personnel policies and investigate employee matters."  (Matus Declaration, Doc. 56-2, ¶14.)  It was not disclosed to the public that the "employee matter" at issue at that time involved the allegations against Dr. Matus, and Dr. Matus was not informed that allegations had been asserted against him or that he

was being investigated. (Matus Declaration, Doc. 56-2, ¶¶14-15.) The next day, September 13, 2012, Board President Von Hofen (Dr. Matus's brother-in-law) informed Dr. Matus that he could no longer speak to him. (Matus Declaration, Doc. 56-2, ¶16.) Dr. Matus states that that was the last time he spoke to his brother-in-law. (Matus Declaration, Doc. 56-2, ¶16.)

On October 9, 2012, Mr. Pearce and Assistant Prosecutor Davey met with representatives of Clemans Nelson to discuss the investigation of the allegations regarding Dr. Matus. (Joint Stipulation, Doc. 58, ¶22; Conley Depo, Doc. 59-8, p. 19.) On October 26, 2012 and November 5, 2012, Clemans Nelson representatives interviewed four current, and one former, Board of Health Health Educators who had had interactions with Dr. Matus. The interviewees were informed that the purpose of the interviews was "to investigate possible inappropriate conduct by the Medical Director." (Joint Stipulations, Doc. 58, ¶28; Memorandum of Investigation, Doc. 58-17, p. 2.)

After completing the interviews, Sandy Conley of Clemans Nelson drafted a Memorandum of Investigation, in which she explained that Ms. Charles:

> affirmed that neither inappropriate touching nor physical contact occurred, but indicated that she felt that the Medical Director was sitting too close, that she was uncomfortable at the time, and that she perceived this as an invasion of personal space, or invasion into space reserved only for family members. She was not quite sure however that the Medical Director even noticed he was that close.

(Memorandum of Investigation, Doc. 58-17, p. 3). The Memorandum of Investigation stated that the interviewees cited no specific incidents that they would consider "inappropriate conduct" or "sexual harassment," but that the Mr. Matus "did conduct himself differently than other male professionals within the Department." (Memorandum of Investigation, Doc. 58-17, p. 4.) Specifically, he acted in a way that was "overly flirtatious," "creepy," "weird," or

"awkward," and that he positioned himself closely when talking, but his behavior did not "rise to the level of making them uncomfortable" and "they did not take offense." (Memorandum of Investigation, Doc. 58-17, p. 4.) The Memorandum of Investigation concluded that there was no evidence that Dr. Matus engaged in sexual harassment. (Doc. 58-17, p. 5). The Memorandum of Investigation opined that "perhaps a generational difference may exist with the female health educators being in their twenties and [early] thirties and the Medical Director being in his early sixties." (Memorandum of Investigation, Doc. 58-17, p. 5.)

Dr. Matus asserts that there are a number of relevant statements made by the interviewees that were not included in the final report. These included one interviewee's assertion that while Dr. Matus had complimented her at work, she was comfortable around Dr. Matus. (Conley Depo, Doc. 59-8, p. 46.) Another interviewee, Laura Baus, stated that Dr. Matus "was not a sexual harasser" and she questioned the motives of the complainant Ms. Charles, stating that Ms. Charles "could exaggerate or put someone else on [the] line and that there was "lots of controversy in her." (Conley Depo., Doc. 59-8, pp. 61-63.) Another interviewee questioned the timing of the investigation, stating "why now?" (Conley Depo, Doc. 59-8, p. 71.)

Dr. Matus maintains that the investigation failed to meet any applicable standard or guideline for the investigation of a sexual harassment complaint. (Doc. 56-1 at 21.) Dr. Matus asserts that Ms. Conley acknowledged that Equal Employment Opportunity Commission Guidelines were authoritative, but the investigation failed to follow those guidelines. While the investigation was ongoing, Dr. Matus was never informed that a complaint had been lodged against him, nor was Dr. Matus informed that he was being investigated. He was never interviewed by Clemans Nelson; he was never informed that per the guidelines he must refrain

11

from taking any retaliatory action against anyone who made a complaint; and, he was never asked any of the questions recommended by the EEOC. (Matus Declaration, Doc. 56-2, ¶19.) During his deposition, Board Member Spreng stated that he assumed that Dr. Matus had been interviewed and that he was "shocked" when he learned he was not. (Spreng Depo., Doc. 59-6, p. 50.) Mr. Von Hofen indicated that he also expected that Dr. Matus would have been interviewed. (Von Hofen Depo., Doc. 59-7, p. 64.) Defendants' expert concluded that there was no reasonable justification for the Health District's failure to interview Dr. Matus with respect the allegations lodged against him. (Doc. 61-1, p. 15.)

**F.      Dr. Matus Hears Rumors of the Investigation.**

In early November through December of 2012, Dr. Matus and his wife – who is also a Health District employee – began to notice that other employees in the workplace were treating them differently. (Matus Declaration, Doc. 56-2, ¶21.) Dr. Matus claims that during that time, employees who were usually friendly and who previously engaged in conversation with them were avoiding them. (Matus Depo., Doc. 59-14, pp. 29-30.) On December 8, 2012, Dr. Matus received a call from Laura Baus (a former employee of the Health District) who informed him that she had been interviewed by someone from Clemans Nelson about allegations of sexual harassment against him. (Matus Declaration, Doc. 56-2, ¶22.) Ms. Baus informed Dr. Matus that she suspected that Stephanie Charles was the individual who made the complaint. (Matus Declaration, Doc. 56-2, ¶22.)

Dr. Matus states that after learning that he was the subject of an investigation, he "began to experience outright panic, distress and confusion." (Matus Declaration, Doc. 56-2, ¶24.) He states that he believed that his "good name and reputation were being tarnished by allegations of

12

which [he] had no knowledge." (Matus Declaration, Doc. 56-2, ¶24.)  On December 10, 2012,

Dr. Matus asked Tonya Kollen "whether anything was going on about me in the Health

Department, because [he] sensed something was wrong." (Matus Declaration, Doc. 56-2, ¶25.)

Ms. Kollen stated that she was not aware that anything was going on.  (Matus Declaration, Doc.

56-2, ¶25.)

On December 12, 2012, the investigation of Dr. Matus was discussed by the Board

during executive session. (Joint Stipulations, Doc. 58, ¶29.)  Although the Clemans Nelson

Report was complete by that time, it was not presented to the Board.  (McCullough Depo., Doc.

59-2, p. 40.) Assistant Prosecutor Jerry Innes orally presented the findings of the investigation to

the Board.  (Spreng Depo., Doc. 59-6, p. 54.)  Board Vice President Spreng testified that as of

December 12, 2012, the investigation was over.  (Spreng Depo., Doc. 59-6, p. 54.)  As Board

President Von Hofen understood it, the investigation was "done" as of December 15, 2012.

(Von Hofen Depo., Doc. 59-7, pp. 84-85.)  The Board instructed Mr. Covell, who was serving as

Deputy Commissioner at the time, to meet with Dr. Matus and inform him of the outcome of the

investigation.  (Spreng Depo, 59-6, p. 56.)

**G.      Dr. Matus's Attempts to Gather Information About the Investigation.**

On December 12, 2012, following the Board meeting, Dr. Matus approached Assistant

Prosecutor Innes and attempted to discuss whether an investigation was underway and, if so, the

basis for the investigation.  (Matus Declaration, Doc. 56-2, ¶26.)  Assistant Prosecutor Innes

refused to confirm or deny the existence of an investigation, stating only that "there have been

complaints."  (Matus Depo., Doc. 56-2, pp. 62-63.)

13

On December 14, 2012, Dr. Matus and Deputy Health Commissioner Covell had a "get to know you" lunch at a restaurant.  When lunch was over and the two men were in the parking lot, the investigation was discussed.  (Matus Declaration, Doc. 56-2, ¶27.)  According to Deputy Health Commissioner Covell's deposition testimony, he confirmed that there was an investigation; that the investigation was over; and, that there was no evidence of sexual harassment but noted that sensitivity training could be in order.  Deputy Health Commissioner Covell allegedly explained to Dr. Matus that once the "entire" investigation was presented to the Board, there would be an additional conversation with Dr. Matus.  Dr. Matus remembers the interaction somewhat differently, claiming that he was given the impression that the investigation was not yet complete.  (Matus Declaration, Doc. 56-2, ¶28.)  According to Dr. Matus, Deputy Health Commissioner Covell told Dr. Matus that he thought the Board would talk to him, but he should "just wait."  (Matus Declaration, Doc. 56-2, ¶27.)

**H.     Dr. Matus's Call to Ms. Charles's Ex-Husband.**

On January 6, 2013, Dr. Matus called Stephanie Charles's ex-husband, David Charles.  Dr. Matus and Mr. Charles present two different versions of what transpired during that conversation.  Dr. Matus asserts that he knew that a Board meeting was scheduled for January 9, 2013.  (Matus Declaration, Doc. 56-2, ¶¶29-30.)  He was expecting, based on his previous conversation with Deputy Health Commissioner Covell, that more information regarding the sexual harassment investigation would be made available to him in advance of the meeting.  (Matus Declaration, Doc. 56-2, ¶¶29-30.)  By January 6, 2013, he claims that he still had not been advised as to the charges against him; who made the charges; and, or the final outcome of the investigation. (Matus Declaration, Doc. 56-2, ¶¶29-30.)  Dr. Matus claims to have believed

14

that he would potentially have to defend himself against the charges at the Board meeting. (Matus Declaration, Doc. 56-2, ¶¶29-30.)

Suspecting that Ms. Charles was the individual who made the sexual harassment complaint, Dr. Matus decided to contact Mr. Charles in order to determine whether he knew anything about allegations.  (Matus Declaration, Doc. 56-2, ¶¶29-30.)  Dr. Matus claims he asked Mr. Charles whether Ms. Charles was the type of person who would make up lies about another person.  (Matus Declaration, Doc. 56-2, ¶30.)  Mr. Charles allegedly told Dr. Matus that he did not know anything about the allegations and stated "the Stephanie that I know" would not make up lies.  (Matus Declaration, Doc. 56-2, ¶30.)

Dr. Matus reportedly asked Mr. Charles not to tell Ms. Charles about the call to him, but Mr. Charles immediately called her.  (Stephanie Charles Depo, 59-5, p.70.)  Mr. Charles testified that Ms. Charles was "upset," "emotional," and "offended" that Dr. Matus had contacted him. (D. Charles Depo., Doc. 59-13, p. 17.)  She in turn allegedly reported the call both to Tanya Kollen (her Supervisor) and to Deputy Health Commissioner Covell.  (Joint Stipulations, Doc. 58, ¶35; Covell Depo., 59-12, p. 38.)  Deputy Health Commissioner Covell testified that he spoke with Ms. Charles and that she "did not go into a lot of detail but kind of felt like it was a retaliatory phone call because it caused a problem with her ex-husband."  (Covell Depo., Doc. 59-12, p. 39.)  Deputy Health Commissioner Covell also spoke to Mr. Charles and Mr. Charles testified that he "probably portrayed [to Mr. Covell] that it was an annoying phone call."  (Dave Charles Depo. 24.)

Defendants maintain that Dr. Matus took the opportunity to disparage Ms. Charles over the course of a forty-five minute phone call with Mr. Charles.  (Stephanie Charles Depo., Doc.

59-5, pp. 70-71.)  Defendants' assertion that Dr. Matus used disparaging language in reference to Ms. Charles appears to be based on Ms. Charles's account of what her ex-husband told her Dr. Matus had said.  Dr. Matus, on the other hand, asserts that based on Mr. Charles's own deposition testimony, Dr. Matus did not refer to Ms. Charles as a liar, or as being dishonest, or that she could not be trusted.  (David Charles Depo., Doc. 59-13, p. 16.)  Mr. Charles further testified that Dr. Matus did not direct any specific comments toward Ms. Charles and, according to Mr. Charles, Dr. Matus did not "berate" or "slam" Ms. Charles during the phone call. (David Charles Depo., Doc. 59-13, pp. 20, 31.)  As Dr. Matus characterizes it, the phone call was simply an effort to gather information about the sexual harassment investigation.

I.      **The Board Learns of Dr. Matus's call to Mr. Charles and Seeks Dr. Matus's Resignation.**

On January 9, 2013, there was a regularly scheduled Board Meeting which Dr. Matus attended.  (Joint Stipulations, Doc. 58, ¶38; Matus Declaration, Doc. 56-2, ¶31.)  Based on his December conversation with Deputy Health Commissioner Covell, Dr. Matus states that he expected that he would have an opportunity to address the Board with respect to the allegations. (Matus Declaration, Doc. 56-2, ¶31.)  He asked Deputy Health Commissioner Covell for the opportunity to do so, but Deputy Health Commissioner Covell told Dr. Matus that the Board did not want to be addressed at that time.  (Matus Declaration, Doc. 56-2, ¶31.)  Deputy Health Commissioner Covell informed Dr. Matus that the Board had asked instead that he, a Prosecutor, and a Board Member meet privately and confidentially with Dr. Matus.  (Matus Declaration, Doc. 56-2, ¶31.)  Deputy Health Commissioner Covell explained that Dr. Matus would then be told "everything" about the allegations and the investigation.  (Matus Declaration, Doc. 56-2,

16

¶31.)  Dr. Matus asked Deputy Health Commissioner Covell if he should have an attorney with him, and Deputy Health Commissioner Covell stated that "there was no need for an attorney." (Matus Declaration, Doc. 56-2, ¶31.)

Unbeknownst to Dr. Matus, during an executive session of the January 9, 2013 meeting, Deputy Health Commissioner Covell had reported to the Board that Dr. Matus had contacted Ms. Charles' ex-husband. (Covell Depo., Doc. 59-12, p. 41.)  According to Board Member Spreng's deposition testimony, the Board was told that Dr. Matus had made disparaging comments about Ms. Charles during the conversation.  (Spreng Depo., Doc. 59-6, pp. 62-62.)  Deputy Health Commissioner Covell testified that he and the Board viewed the call to Mr. Charles to be a very serious matter.  (Covell Depo., Doc. 59-12, 46-50.)  In their view, the phone call was cause for disciplinary action.  (Covell Depo., Doc. 59-12, pp. 50-52.)   There was discussion by the Board that if Dr. Matus wanted to offer his resignation, then the matter would not become public and a hearing could be avoided.  (Covell Depo., Doc. 59-12, pp. 50-52.)

On January 11, 2013, Dr. Matus met with Assistant Prosecutor Innes, Deputy Health Commissioner Covell, and Board Vice President Spreng.  (Joint Stipulations, Doc. 58, ¶39; Matus Declaration, Doc. 56-2, ¶34.)  According to Dr. Matus, Assistant Prosecutor Innes led the meeting and indicated that he wished to discuss the "situation" with Dr. Matus "more as a friend than as a prosecutor."  (Matus Declaration, Doc. 56-2, ¶34.)  Assistant Prosecutor Innes then informed Dr. Matus that the Board had decided to demand his resignation and that if he did not agree to resign his employment would be terminated.  (Matus Declaration, Doc. 56-2, ¶34.)  According to Dr. Matus, Assistant Prosecutor Innes asserted that he was reading some of the conclusions set forth in the Clemans Nelson report, but he refused to provide a copy to Dr.

Matus.  (Matus Declaration, Doc. 56-2, ¶35.)  Assistant Prosecutor Innes allegedly informed Dr.

Matus that while the "complaints did not rise to the level of sexual harassment, there were more

serious [new] charges that needed to be addressed."  (Matus Declaration, Doc. 56-2, ¶35.)

Assistant Prosecutor Innes explained to Dr. Matus that the new charges were that Dr. Matus had

interfered with an ongoing investigation; that he was deceptive to Deputy Health Commissioner

Covell during the December 14, 2012 meeting at the restaurant; and, that he had "reached into

the private life of another employee" who had accused him of harassment.  (Matus Declaration,

Doc. 56-2, ¶35.)  Dr. Matus was not provided with a written summary of the new charges.

(Matus Declaration, Doc. 56-2, ¶36.)

Dr. Matus contends that Assistant Prosecutor Innes then asked him for his "side of the

story." (Matus Declaration, Doc. 56-2, ¶36.)  According to Dr. Matus, he questioned the

underlying allegations, which were still unknown to him.  (Matus Declaration, Doc. 56-2, ¶36.)

He raised concerns over the fairness of the investigation and the reliability of "one woman who

may have accused him of inappropriate conduct."  (Matus Declaration, Doc. 56-2, ¶36.)  Dr.

Matus also claims to have alleged that more serious charges of workplace harassment involving

another male Health District employee had not been investigated.  (Matus Declaration, Doc. 56-

2, ¶36.)

Board Vice President Spreng testified that Dr. Matus's behavior at the January 11, 2013

meeting was "out of control" and "erratic" and that Dr. Matus became combative and began

berating Ken Pearce. (Spreng Depo., Doc. 59-6, pp. 74-75.)  Defendants characterized Dr.

Matus's statements as "threats" made against the Board.  (Matus Declaration, Doc.56-2, ¶37.)

Assistant Prosecutor Innes would later claim that about halfway through the meeting, "he put on

18

his prosecutor's hat," and that Dr. Matus's threats were almost "criminal."  (Matus Declaration, Doc.56-2, ¶38.)  Defendants also assert that during the meeting Dr. Matus related information which suggested that Dr. Matus had been stalking Ms. Charles.  (Matus Depo., Doc. 59-14, p. 101.)  Dr. Matus, for his part, says that he did not make any threats, but rather he was being responsive to their questions.  (Matus Declaration, Doc. 56-2, ¶37.)  He claims that he was "blindsided by the tone and substance of the meeting."  (Matus Declaration, Doc. 56-2, ¶37.)  Dr. Matus indicates that he was discouraged from bringing an attorney to what he expected would be a confidential, private meeting and what turned out to be a demand for his resignation.  (Matus Declaration, Doc. 56-2, ¶37.)

The meeting concluded with Assistant Prosecutor Innes, Deputy Health Commissioner Covell, and Board Vice President Spreng advising Dr. Matus that he would be given until January 18, 2013 to submit his written resignation or publically face disciplinary proceedings. (Matus Declaration, Doc. 56-2, ¶39; Covell Depo, Doc. 59-12, pp. 58-60; Spreng Depo., Doc. 59-6,  p. 69.)

**J.      The Board Proceeds With a Pre-Disciplinary Hearing**.

On or about January 18, 2013, Dr. Matus, through Counsel, demanded a fair and full Pre-Disciplinary Hearing pursuant to the Health District's Employee Policy, Section 5.2.  (Matus Declaration, Doc. 56-2, ¶40.)  On January 23, 2013, the Board called an emergency meeting in executive session in order to consider dismissal or disciplinary against Dr. Matus and to discuss the investigation.  (Matus Declaration, Doc. 56-2, ¶41; Joint Stipulation, Doc. 58, ¶41.)  Deputy Health Commissioner Covell, Assistant Prosecutor Innes, and Board Vice President Spreng indicated that they felt "shocked" and "assaulted" by Dr. Matus's statements at the January 11,

19

2013 meeting.  (Covell Depo., Doc. 59-12, p. 63; Spreng Depo., Doc. 59-6, p. 74.)  The Board

voted to proceed with a Pre-Disciplinary Hearing to either dismiss or discipline Dr. Matus.  Dr.

Matus was placed on immediate administrative leave and the Board contracted with an outside

law firm to conduct Dr. Matus's Pre-Disciplinary Hearing.

Dr. Matus was provided notice that a Pre-Disciplinary Hearing would take place on

February 22, 2013.  (Notice, Doc. 60-1, pp. 232-35.)  There were seven charges against him:

(1) False accusations regarding Ken Pearce;

(2) Making personal and derogatory attacks upon the moral character and integrity of the
female staff;

(3) Falsely accusing the Board of trying to prevent Dr. Matus from defending himself;

(4) Attempting to eavesdrop on the executive session that occurred during the October
10, 2012 meeting;

(5) Contacting David Charles and attempting to obtain information to use against
Stephanie Charles;

(6) Stating that he would refuse to undergo sensitivity training during the January 11,
2013 meeting; and,

(7) Making numerous allegations of mismanagement and wrongful actions by Board
members and its employees, accusing Pearce of failing to handle more serious sexual
harassment allegations, refusing to disclose the materials in Dr. Matus's possession and
attempting to extort the Health District by claiming he would expose alleged
mismanagement and misconduct of the Board members and employees if disciplinary
actions commenced against him.

(Notice, Doc. 60-1, pp. 233-34.)   The misconduct alleged in these charges was based on the

actions of Dr. Matus during Dr. Matus's meeting with Assistant Prosecutor Innes on December

12, 2012; the phone call to Mr. Charles on January 6, 2013; and, the meeting with Assistant

Prosecutor Innes, Deputy Health Commissioner Covell, and Board Vice President Spreng on

January 11, 2013. (Notice, Doc. 60-1, pp. 233-34.) According to Defendants, these charges constituted offenses both under the Employment Contract – breach of duty, dishonesty, insubordination, and gross misconduct – as well as offenses under the General Health District Personnel Policy – publishing false, vicious, or malicious statements concerning employees, willful disregard for department rules, false claims in an attempt to obtain agency benefit, dishonesty, including extortion of the board, and intentionally taking retaliatory action against an employee who reports incidents of sexual harassment. (Notice, Doc. 60-1, p. 232.) The charges were made public record and published in local newspapers. (Matus Declaration, Doc. 56-2, ¶43.)

On February 20, 2013, two days before the Pre-Disciplinary Hearing, Dr. Matus was provided, for the first time, with a redacted copy of the Clemans Nelson Memorandum of Investigation. (Matus Declaration, Doc. 56-2, ¶44.)

The Board retained Attorney Frank Hatfield to conduct the Pre-Disciplinary Hearing, which was held on February 22, 2013. Dr. Matus testified on his own behalf. Assistant Prosecutor Innes, Deputy Health Commissioner Covell, and Board Vice President Spreng testified on behalf of the Board. On the day of the Pre-Disciplinary Hearing, Dr. Matus received an unredacted copy of the Clemans Nelson Memorandum of Investigation. (Matus Declaration, Doc. 56-2, ¶5.)

On March 27, 2013, Predisciplinary Hearing Officer Hatfield issued written findings ("the Hatfield Opinion"), in which he determined that Dr. Matus did not engage in misconduct relative to Charge #1 (making false accusations about Pearce); Charge #3 (making false

21

accusations as to the Board); Charge #4 (eavesdropping on the Board); or, Charge #6 (refusing to undergo sensitivity training).  (Hatfield Opinion, Doc. 60-1, p. 187.)

It was determined, however, that Dr. Matus engaged in misconduct as to Charges 2, 5, and 7.  (Hatfield Opinion, Doc. 60-1, p. 187.)  Relative to Charge 2, the Hearing Officer determined that Dr. Matus made derogatory comments as to female district staff, when during the December 12 meeting he stated "these women are terrible" and otherwise "lashed out" toward female employees.  (Hatfield Opinion, Doc. 60-1, pp. 183-84.)  Relative to Charge 5, the Hearing Officer concluded that Dr. Matus engaged in misconduct when he contacted Ms. Charles ex-husband on January 6, 2013.  (Hatfield Opinion, Doc. 60-1, pp. 185-86.)  Relative to Charge 7, the Hearing Officer concluded that Dr. Matus engaged in misconduct when he refused to allow the District to copy documents in his possession relative to the alleged misconduct of district employees. (Hatfield Opinion, Doc. 60-1, pp. 186-87.)

The findings were reported to the Board on March 27, 2013.  At a regularly scheduled Board meeting on April 10, 2013, the Board voted to terminate Dr. Matus's employment. (Matus Declaration, Doc. 56-2, ¶51.)   Dr. Matus points out that in making its decision, the Board did not review the Hatfield Opinion; the Clemans Nelson Report; or, the letter drafted by Mr. Pearce. Instead, the Board relied on the verbal reports of Deputy Health Commissioner Covell and the advice of Counsel.   (Covell Depo, Doc. 59-12, pp. 34-35, 75-76; McCullough Depo., Doc. 59-2, pp. 57-58, 59-60.)  According to Board Member McCullough's testimony, no evidence was presented to the Board to justify Dr. Matus's termination.  (McCullough Depo., Doc. 59-2, pp. 57-58.)  According to Board Vice President Spreng, the Board concluded that termination was appropriate based on Dr. Matus's call to Mr. Charles and based on his behavior at the January

11, 2013 meeting, during which he was reportedly "out of control" and "erratic." (Spreng Depo., Doc. 59-6, pp. 73-75.) The Board notified Dr. Matus of the decision on April 12, 2013, and Dr. Matus was given thirty days notice of termination. (Joint Stipulation, Doc. 58, ¶49.)

### III.  Standard of Review

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

## IV.  Law and Argument

**A**.      **First Amendment Retaliation – 42 U.S.C. § 1983**.

The discussion begins with Dr. Matus's only federal claim: First Amendment retaliation pursuant to 42 U.S.C. § 1983.  A plaintiff claiming First Amendment retaliation must establish the following elements: (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and, (3) that the adverse action was motivated, at least in part, as a response to the exercise of the plaintiff's constitutional rights.  *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir.2000).  If Dr. Matus makes this showing, the burden then shifts to Defendants to show by a preponderance of the evidence "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted).

24

For a public employee's statements to receive First Amendment protection, the public employee must speak "as a citizen" and "address[ ] matters of public concern." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Under *Garcetti*, "even employee speech addressing a matter of public concern is not protected if made pursuant to the employee's official duties." *Weisbarth*, 499 F.3d at 545. Thus, in reviewing a public employee's statement under *Garcetti*, the Court must consider both its content and context – including to whom the statement was made – to determine whether the plaintiff made the statement pursuant to his individual duties. *See id.*; *see also Haynes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007).

Speech by a public employee made pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it "owes its existence to [the speaker's] professional responsibilities." *Weisbarth*, 499 F.3d at 544 (quoting *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). In *Weisbarth*, for example, a park ranger's statements about morale and performance issued to an outside consultant hired by the ranger department to assess these matters were made pursuant to her official duties, even though participating in the interview was an *ad hoc* duty not described in the ranger's official job description. *Id.* at 543–44. Likewise, in *Haynes*, a police officer's memo to his superior officer expressing discontent about the financial cutbacks and changes to the canine-training program that he directed was not protected speech. *See* 474 F.3d at 365. The memo communicated "nothing more than 'the quintessential employee

25

beef: management has acted incompetently.'" *Id.* (quoting *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988)).

In contrast in *Pucci v. Nineteenth District Court*, 628 F.3d 752 (6th Cir. 2010), the plaintiff, a deputy court administrator, spoke as a citizen on a matter of public concern when she complained to the Regional and State Court Administrative Officer about one of the judges of the court imposing his personal religious belief into judicial proceedings and the business of the cCurt.  The Sixth Circuit concluded that the plaintiff was not merely complaining that management was acting incompetently.  *Id.* at 768.  Rather, the Court concluded this was "an extraordinary rather than everyday communication." *Id.*  The Court further noted that "the nature of Pucci's complaints implicates the propriety and legality of public, in-court judicial conduct, and renders her speech of sufficient public gravity to warrant First Amendment protection." *Id.*

Like the employees in *Weisbarth* and *Haynes*, Dr. Matus's statements during the January 11, 2013 meeting were made as a public employee and not as a citizen.  Dr. Matus's statements were directed at Deputy Commissioner Covell, Board Vice President Spreng and Assistant Prosecutor Innes, not at the general public.  During the January 11, 2013 meeting, Dr. Matus voiced his opinions on the competency of the Board of Health and its investigators; expressed his opinions on the overall performance of Defendant Pearce as Health Commissioner; and, expressed his views on the overall performance of members of the Board of Health.  These statements owe their existence to Dr. Matus's employment as Medical Director.  The nature of those complaints is unlike that in *Pucci*, where the Court concluded that the plaintiff's speech was of "sufficient public gravity to warrant First Amendment protection."  Rather, as Dr. Matus himself states, he was simply challenging the competency of Mr. Pearce, the Board of Health,

26

and its investigators. Thus, similar to *Haynes*, Dr. Matus's complaints amount to little more than the "quintessential employee beef."

In sum, Dr. Matus fails to supply evidence by which a reasonable jury could conclude that Dr. Matus engaged in conduct protected by the First Amendment when he stated his opinions as to the competency of management during the January 11, 2013 meeting. Therefore, Dr. Matus's First Amendment retaliation fails as a matter of law in this regard.

Dr. Matus also alleges that Defendants retaliated against him in response to statements made by his brother-in-law, Board President Von Hofen, during the August 15, 2012 meeting. Specifically, Dr. Matus asserts that Defendants initiated their sexual harassment investigation of him because Dr. Matus's brother-in-law had openly opposed Mr. Pearce's alleged attempts to "double dip."

The first question is whether Dr. Matus may bring a retaliation claim stemming from his brother-in-law's comments. There is support for the idea that a claim for relief may be brought where an individual has been retaliated against for protected speech of a third person. For example, in *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014), the Sixth Circuit recognized a First Amendment retaliation claim where a university took an adverse employment action against the plaintiff (a professor at the university) whose husband (a student at the university) had sponsored a no confidence vote against the provost and university president. Relying on *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011), the Court accepted without analysis that the plaintiff could bring a retaliation claim stemming from a third party's (her husband) protected speech.

In *Thompson*, which Dr. Matus cites in his briefing, the plaintiff argued that his employer violated the anti-retaliation provisions of Title VII, when it fired him after another employee, his fiance, filed an EEOC charge. *Id.* at 172-73. The United States Supreme Court concluded that Title VII prohibits certain third party reprisals, which included in that instance the firing of a plaintiff in retaliation for the fiance's EEOC filing. The Court reasoned that "a reasonable worker might be dissuaded from engaging in protected activity if she knew that her fiancé would be fired." *Id.* at 868. The *Thompson* Court acknowledged potential line-drawing problems when it comes to allowing third-party reprisal claims, asking "[p]erhaps retaliating against an employee by firing his fiance would dissuade the employee from engaging in protected activity, but what about firing an employee's girlfriend, close friend, or trusted co-worker?" *Id.* While the Court declined to generalize, it opined that, in the context of Title VII retaliation, "firing a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so."[4] *Id.*

In this instance, Dr. Matus asks the court to simply assume that Dr. Matus may base his retaliation claim on the protected speech of his brother-in-law, and he fails to recognize the line-drawing problem noted in *Thompson*. In addition, while it appears that the Sixth Circuit has, based on *Thompson*, implicitly accepted third-party reprisal claims in the context of the First Amendment, at least where a plaintiff's retaliation claim is based on the protected speech of the

---

[4] *Burlington* established that Title VII's antiretaliation provision prohibits any employer action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted).

plaintiff's husband, Dr. Matus supplies no meaningful argument that such a claim would be viable here, where Dr. Matus's claim is based on the speech of his brother-in-law.

Even if Dr. Matus had offered a persuasive argument that his third-party First Amendment reprisal claim is cognizable, there is an additional problem as he fails to provide sufficient evidence of a causal connection between Board President Von Hofen's speech and Defendants' decision to investigate and ultimately terminate Dr. Matus. Dr. Matus notes that there is a temporal proximity between Board President Von Hofen's statements during the August 15, 2012 board meeting and the decision to investigate Dr. Matus but, as Dr. Matus acknowledges, temporal proximity alone is insufficient to show causation. *See Randolph v. Ohio Dep't of Youth Services*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."). Dr. Matus cites other evidence he claims establishes a nexus between Board President Von Hofen's speech and the decision to investigate Dr. Matus. This evidence includes testimony that the day after the August 15, 2012 meeting, Mr. Pearce instructed staff members that they were no longer permitted to have any direct contact with Dr. Matus; testimony that in the week following the meeting, Mr. Pearce informed Tanas Wilcox that the Board "will take care of Dr. Matus," "they need to clean house," and "the prosecutor's office will straighten everything out;" and, evidence that on August 22, 2012, Dr. Matus's Employment Agreement was faxed to the prosecutor's office.

This evidence fails to establish a causal connection between the statements made by Board President Von Hofen at the August 15, 2012 meeting and any adverse employment action that may have been taken against Dr. Matus. While there is a temporal proximity between Board

President Von Hofen's speech and the evidence noted in the paragraph above, there is no evidence by which a jury could reasonably infer that Mr. Pearce took any adverse action against Dr. Matus *because* of Board President Von Hofen's speech. Based on the record, it appears that even before the August 15, 2012 meeting, Mr. Pearce had already decided to notify the Board of Ms. Charles's complaint against Dr. Matus.

In sum, Dr. Matus has failed to provide evidence that would demonstrate to a reasonable jury that he engaged in protected activity when he spoke to Deputy Commissioner Covell, Board Vice President Spreng, and Assistant Prosecutor Innes during the January 11, 2013. Dr. Matus also fails to provide support for the idea that he may base his First Amendment retaliation claim on comments made by his brother-in-law. In addition, Dr. Matus has not provided evidence to demonstrate a causal connection between his brother-in-law's speech and the sexual harassment investigation and his ultimate termination. Because Dr. Matus has not provided evidence to show that his First Amendment rights were violated, Defendants' Motion for Summary Judgment will be granted on this claim.

**B.** **Supplemental Jurisdiction.**

This matter was removed on the basis of the Court's Federal question jurisdiction. As described above, the Court has determined that Defendants are entitled to summary judgment as to Dr. Matus's only federal claim. When a district court dismisses all claims over which it had original jurisdiction, it may retain jurisdiction over the plaintiff's supplemental State law claims. *See* 28 U.S.C. 1367(c). District courts possess "broad discretion" to decide whether to exercise supplemental jurisdiction in such an instance. *Gamel v. City of Cincinnati*, 625 F.3d 949, 951–52 (6th Cir.2010).

In exercising its discretion, the Court considers convenience, comity, fairness, and judicial economy.  *Id*.  Relevant factors include the difficulty or novelty of the State law issues, *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047, 1055 n. 11 (6th Cir.1986); whether the Court can avoid needless State law decisions, *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993); whether the District Court, in its disposition of Federal law claim, resolved a related State law issue, *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521–22 (6th Cir. 2007); whether similar predicate factual findings are necessary to resolve both the State and the Federal claims, *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir.1991) (citing Province, 787 F.2d at 1055); whether the District Court has expended significant time and resources, *Aschinger*, 934 F.2d at 1413; whether dismissal or remand will result in duplicative litigation, *Province*, 787 F.2d at 1054; whether the matter has been on the District Court's Docket for a significant time, *Harper v. AutoAlliance, Intern., Inc.*, 392 F.3d 195, 211 (6th Cir., 2004); whether the Parties have completed discovery, *Aschinger*, 934 F.2d at 1413; whether the District Court has gained significant familiarity with the case through previous substantive rulings, *Harper*, 392 F.3d at 211; and, whether a summary judgment motion has been filed and is ripe for review and, if so, how extensively it has been briefed, *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992).

In the present case, the balance of factors weigh in favor of retaining jurisdiction. This matter has been on the Court's Docket since May 7, 2013, and the Parties have conducted extensive fact and expert discovery, which was completed in March of 2014.  The Parties have produced a lengthy factual record and their Motions for Summary Judgment have been pending for well over a year.  In October of 2015, with the retirement of Judge Lesley Wells, this matter

was reassigned to the undersigned Judge. Once the pending Motions for Summary Judgment are resolved, this matter will be ready for trial and the Court has set a trial date for February 10, 2016.

While the Court is sensitive to issues of comity, the State law issues presented are neither difficult or novel. Both the Parties and the Court have expended significant time and resources toward the resolution of this matter. The factors of convenience, fairness, and judicial economy outweigh any countervailing factor. Accordingly, the Court retains jurisdiction over Dr. Matus's state law claims, which are addressed below.

### 1. **Breach of Contract**.

Dr. Matus and Defendants both move for summary judgment on Dr. Matus's breach of contract claim. To succeed on a claim for breach of contract, a plaintiff must prove: (1) the existence of a binding contract or agreement; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damages to the plaintiff as a result of the breach. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App.3d 95, 108, 661 N.E.2d 218, 226 (1995).

The Employment Agreement at issue in this case reads, in pertinent part, as follows:

> This Agreement may be terminated by either party for cause at any time, with thirty (30) days written notice. "Cause" shall mean, but not be limited to breach or neglect of duty, violation of any law, dishonesty, insubordination, or gross misconduct.

(Doc. 58-2). Defendants argue that Dr. Matus cannot succeed on his breach of contract claim for two reasons: (1) because the contract was void; and (2) because he was terminated for cause.

### a. **Whether the Employment Agreement is Void.**

Defendants argue that the Employment Agreement is void and cannot be enforced because it attempts to confer rights on Dr. Matus in a manner contrary to Ohio law. Specifically,

32

Defendants argue that by its terms, the Employment Agreement is a "continuing contract," but that in Ohio, unclassified civil servants are not entitled to continuing employment.  Defendants assert that Dr. Matus is an unclassified civil servant and, therefore, that because the Employment Agreement is designed as a "continuing contract" it is contrary to Ohio law; void; and, that any claim that the Employment Agreement was breached is without merit.  (Covell Aff., Doc. 60-10, ¶4.)

Ohio law recognizes two categories of employees: classified and unclassified.  As described by one Ohio Court of Appeals:

> the chief distinguishing characteristic between employees in the classified service and those in the unclassified service is the procedural protection afforded to classified servants from arbitrary removal from their employment.  *See* R.C. 124.34.  Generally, classified civil servants have a right to a hearing before removal, the employer must show cause for removal, and the employer's actions are subject to further review.  *State, ex rel. Proctor v. Bd. of Edn.*(1978), 60 Ohio App.2d 396, 398.
>
> Unclassified civil servants are not afforded such procedural protections, and have no entitlement to continued employment. Unclassified civil servants serve at the discretion of the appointing authority, and may be dismissed from their employment without cause. *See State, ex rel. Trimble v. State Bd. of Cosmetology* (1977), 50 Ohio St.2d 283; Ohio Assn. P.S.E. v. Bd. of Edn.(1971), 28 Ohio St.2d 58; *Eudela v. Ohio Dept. of Mental Health & Retardation* (1986), 30 Ohio App.3d 113; *Huber v. Celebrezze* (1984), 14 Ohio App.3d 299.

*Davidson v. Sheffield-Sheffield Lake Bd. of Educ.*, No. 89CA004624, 1990 WL 72316, at *2 (Ohio Ct. App. May 23, 1990).

In *Davidson*, the plaintiff, Secretary to the Superintendent of the Sheffield-Sheffield Lake School System claimed she was wrongfully terminated.  She was subject to an Employment Contract which provided:

> The said Sharon K. Davidson hereby agrees to be employed as Superintendent's Secretary in the public schools of said district from the date of this contract until she resigns, elects

> to retire, is retired pursuant to law, or until said contract is terminated or suspended as provided by law . . . .

*Id.* at *1. Although the plaintiff did not dispute that she was a unclassified employee, she argued that she was effectively a classified employee with a right to a hearing prior to termination of her contract. *Id.* at *2. The Court disagreed, finding her to be an unclassified employee under Ohio Revised Code § 124.11(A). *Id.* The Court noted that the question whether an employee is classified or unclassified is a legislative function, which cannot be circumvented by administrative action. *Id.* at 2-3. As such, it was determined that the school did not have the power promise her employment of a "continuing" nature such that the plaintiff would be entitled to the procedural safeguards generally provided to classified employees. *Id.* at 3.

In the present case, Defendants argue that like the *Davidson* plaintiff, Dr. Matus is unclassified; that the Health District was not obligated to provide him the procedural safeguards normally afforded to classified employees prior to termination; and, that Dr. Matus cannot claim that any obligation to him was breached. Defendants' argument is unpersuasive for two reasons. First, while perhaps not dispositive of the issue, both Dr. Matus and Defendants relied on the Employment Agreement and acted as though it were binding. As described above, Dr. Matus was in fact treated as a classified employee since he was provided with notice of the charges against him and an opportunity to be heard prior to his termination.

Second, and more importantly, unlike *Davidson*, it is not established as a matter of statute that Dr. Matus is an unclassified employee. Defendants assert that Dr. Matus is unclassified pursuant to R.C. 124.11(A)(28), which provides that "unclassified service" includes:

> [f]or cities, counties, civil service townships, city health districts, general health districts, and city school districts, the deputies and assistants of elective or principal executive

34

officers authorized to act for and in the place of their principals or holding a fiduciary relation to their principals.

In support of their contention that Dr. Matus falls into this category, Defendants refer to Deputy Commissioner Covell's Affidavit, in which he states that "while serving as the Medical Director of the Lorain County General Health District, Dr. Paul Matus was a contracted, unclassified employee." (Covell Affidavit, Doc. 60-10, ¶4.)

In response, Dr. Matus asserts that he is not an unclassified employee, because he was neither "a deput[y] or an assistant[ ] of an elective or principal executive officer." Rather, Dr. Matus asserts he was appointed by the Board of Health and he reports to the Directors of the Board, not the executive or principal officer. Dr. Matus notes that, as stated in Ohio Revised Code 3709.11, "[t]he medical director shall be responsible to the board of health."

Defendants failed to establish that Dr. Matus is an unclassified employee as a matter of law and the Court rejects Deputy Health Commissioner Covell's Affidavit as a basis for deciding the issue. The question is whether the position of Medical Director should be deemed "unclassified" pursuant to R.C. 124.11(A)(28). Defendants provide Deputy Health Commissioner Covell's conclusory assertion that Dr. Matus was unclassified, but they supply no evidence or argument to show that Dr. Matus was either a deputy or assistant of "elective or principal executive officers" or that he was "authorized to act for and in the place of [his] principals or holding a fiduciary relation to [his] principals." R.C. 124.11(A)(28). Further, Dr. Matus has shown that as a matter of Statute he answered, in his capacity as Medical Director, to the Board of Health and not to an elective or principal executive officer. R.C. 3709.11.

35

Accordingly, the Court rejects Defendants' argument that because Dr. Matus was an unclassified employee his contract for "continuing employment" is void.

        **b.**        **Whether Dr. Matus was Terminated Without Cause.**

Defendants alternatively argue that summary judgment is warranted as to Dr. Matus's Breach of Contract claim because Dr. Matus was provided due process and was terminated for cause. Based on the evidence offered by both Dr. Matus and Defendants in this case, genuine issues of material fact preclude summary judgment as to whether Dr. Matus was terminated for cause. Therefore, the Parties' respective Motions for Summary Judgment will be denied as to this claim.

        **2.**        **Breach of Implied Duty of Good Faith and Fair Dealing.**

Dr. Matus alleges that the Health District breached its duty of good faith and fair dealing by creating a hostile work environment; failing to notify him of the sexual harassment investigation; "refus[ing] to undertake the investigation in a reasonable fashion;" and, terminating him in retaliation for participating in the investigation. (Amended Complaint, ¶¶75-78.) "[T]here is an implied duty of good faith and fair dealing in every contract." *Am. Contractor's Indemn. Co. v. Nicole Gas Production, Ltd.*, Case No. 07AP–1039, 2008 WL 4416671, ¶ 13 (Ohio Ct. App. Sept. 30, 2008). "Public policy dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other. Any agreement—whether a lease, a secured loan, or something else—has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005).

As set forth in detail below, Dr. Matus has failed to demonstrate he was subject to a hostile work environment. However, genuine issues of material fact remain as to the other enumerated basis for Dr. Matus's claim of breach of the implied duty of good faith and fair dealing which preclude summary judgment. Accordingly, the Parties' respective Motions for Summary Judgment are denied as to said claim.

### 3. Age Discrimination in Violation of Ohio Revised Code § 4112.02(N).

Ohio law prohibits employers from discriminating against employees on the basis of age. Ohio Rev. Code § 4112.14. To make out a prima facie case of age discrimination, a plaintiff must show that (1) he was a member of the statutorily-protected class; (2) he was discharged; (3) he was qualified for the position; and, (4) he was replaced by, or his discharge permitted the retention of, a person who did not belong to the protected class. *Barker v. Scovill, Inc., Schrader Bellows Div.*, 6 Ohio St. 3d 146, 148, 451 N.E.2d 807, 809 (1983).

It is undisputed that Dr. Matus's replacement was 52 years old when he was selected for the position of Medical Director. (Covell Affidavit, Doc. 60-10, ¶3.) Therefore, in the absence of opposition from Dr. Matus, summary judgment will be granted in favor of Defendants with respect to Dr. Matus's State law age discrimination claim.

### 4. Hostile Work Environment in Violation of Ohio Revised Code § 4112.02(N).

Dr. Matus claims he was subject to a hostile work environment based on his age. Dr. Matus must prove (1) he was a member of a statutorily protected class; (2) he was subjected to harassment due to his age; and, (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment. A hostile work environment exists "[w]hen the workplace is permeated with

37

'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris Forklift Sys, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

In this instance, Dr. Matus argues that the fact that he was being investigated for sexual harassment without a legitimate basis produced "intimidation, ridicule, and insult" that created an abusive working environment.  While Dr. Matus claims that he subjectively felt embarrassed and uncomfortable due to the rumors that he was being investigated, Dr. Matus does not describe facts that demonstrate an objectively hostile work environment.  Dr. Matus maintains that some employees avoided him during the investigation, but Dr. Matus does not explain how this condition was abusive.  Further, while it is undisputed that Dr. Matus was a member of a protected class, there is no evidence to show that the allegedly harassing investigation or the behavior of other employees during the investigation was initiated on account of Dr. Matus's age. The evidence that Assistant Prosecutor Innes and Board Member Spreng, during an executive session of the Board, referenced the Penn State child abuse scandal, which involved allegations that an elderly football coach sexually abused children, does not provide a link between Dr. Matus's age and the harassment he claims to have experienced.  (Matus Declaration, Doc. 56-10, ¶17.)  In addition, while the Clemans Nelson Report noted a generational difference between Dr. Matus and the younger female employees, Dr. Matus fails to show that this difference, which was noted at the conclusion of the investigation, somehow motivated the allegedly harassing investigation.  Accordingly, Defendants are entitled to summary judgment as to Mr. Matus's State law hostile work environment claim.

**5.** **Retaliation in Violation of Ohio Revised Code Section 4112.02(I)**.

A prima facie case of retaliation under Ohio Revised Code requires evidence that Dr.

Matus (1) engaged in protected activity; (2) that the Defendants were aware that Dr. Matus

engaged in protected activity, (3) that Defendants took an adverse employment action against Dr.

Matus; and, (4) that there is a causal connection between the protected activity and the adverse

action.  *Carney v. Cleveland Hts.-Univ. Hts. City Sch. Dist.*, 143 Ohio App. 3d 415, 428, 758

N.E.2d 234, 245 (2001).  If Dr. Matus presents evidence of a prima facie case, the burden shifts

to Defendants to provide a nondiscriminatory reason for the employment action.  It is then Dr.

Matus's burden to prove that the stated reason is pretextual.[5]

Defendants argue Dr. Matus is unable to establish a prima facie case of retaliation

because Dr. Matus did not engage in protected activity.  Defendants also argue that even if Dr.

Matus did engage in protected activity, summary judgment is still warranted because Dr. Matus

cannot establish a causal link between the alleged protected activity and his termination.

    **a.** **Protected Activity.**

Under Ohio Revised Code 4112.02(I), it is unlawful

> [f]or any person to discriminate in any manner against any other person because that
> person has opposed any unlawful discriminatory practice defined in this section or
> because that person has made a charge, testified, assisted, or participated in any manner in
> any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the
> Revised Code.

---

[5]    Neither Dr. Matus nor Defendants engage the burden shifting framework with
respect to Dr. Matus's retaliation claim. Thus, the Court's analysis is limited to
the question of Dr. Matus's prima facie case of retaliation.

Ohio Rev. Code § 4112.02.  Thus, R.C. 4112.02(I) prohibits discrimination under the following two circumstances: "(1) where an employee has opposed any unlawful discriminatory practice, the 'opposition clause'; and (2) where an employee has made a charge, testified, assisted or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code, the 'participation clause.'" *Coch v. Gem Indus.*, 2005-Ohio-3045, 2005 WL 1414454, ¶ 29 (Ohio Ct. App. June 17, 2005). "The distinction between the opposition and the participation clauses is significant because courts have generally granted less protection for opposition activities than for participation in enforcement proceedings." *Id.* (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir.1989)).

Dr. Matus argues that he was engaging in protected activity pursuant to Ohio Revised Code 4112.02 when he told "his side of the story" at the January 11, 2013 meeting.  Dr. Matus states that during the meeting, upon learning of the results of the investigation, he:

> questioned the underlying allegations and raised [his] concerns over the fairness of the underlying investigation, the reliability of one woman who may have accused [him] of inappropriate conduct, and that more serious charges of workplace harassment involving another male Health District employee had not been investigated.

(Matus Declaration, ¶36.)

Defendants argue that Dr. Matus was not participating in "any investigation, proceeding, or hearing under Sections 4112.01 to 4112.07" because those statutory provisions govern charges, investigations, and proceedings before the Ohio Civil Rights Commission.  Since there was no OCRC case in this instance, Defendants argue that Dr. Matus could not have been engaged in protected activity.

Defendants provide no meaningful support for the idea that the protections of the participation clause apply only in the context of proceedings by the Ohio Civil Rights Commission, and the Court is unconvinced that the Statute's reference to Sections 4112.01 through 4112.07 so limits the scope of protection.  While, as Defendants point out, the noted Statutory provisions do apply in the context of proceedings before the Ohio Civil Rights Commission, those sections also apply in a broader context, as they describe the discriminatory acts generally prohibited under the Act and the available remedies in a private cause of action outside the context of a proceeding brought by the Commission.  See *Meyers v. Goodrich Corp.,* Case No. 95996, 2011 WL 2568081 (Ohio Ct. App. June 30, 2011) (employee had engaged in protected activity by participating in the internal investigation which occurred in the absence of an OCRC complaint); *Hughes v. Miller*, 181 Ohio App. 3d 440 (Cuyahoga Cty. 2009) (an employee participates in a protected activity by filing a formal, internal complaint with the employer).  Similar to *Meyers* and *Hughes*, the sexual harassment investigation in this case took place internally.  Thus, there is no merit to Defendants' argument that Dr. Matus did not engage in protected activity because the investigation took place in the absence of an OCRC complaint.

Defendants further argue that Dr. Matus did not engage in protected activity because he was the subject of the investigation and not the complainant.  The Court disagrees.  Generally, Ohio courts have acknowledged that the participation clause accords "exceptionally broad protection" to persons who have "participated in any manner."  *Coch,* 2005 WL 1414454, ¶ 29. Here, Dr. Matus was participating in the investigation against him when he responded to Defendants' request to provide his side of the story at the January 11, 2013 meeting.  Contrary to Defendants' assertion, it makes no difference that Dr. Matus was himself the subject of the

investigation.  The language of the statute is broad enough to include not only one who complains about a discriminatory practice but also one who is being investigated for engaging in such a practice.  *See Meyers*, 2011 WL 2568081, at *3 (a witness to alleged discriminatory practices engages in protected activity by submitting to an interview by management).

In addition, Federal decisions from other jurisdictions support the idea that the subject of an investigation engages in protected activity when he or she defends against the charges in the context of a Title VII investigation.  For instance, the Second Circuit has held that "defending oneself against charges of discrimination – to the extent that such defense involves actual participation in a Title VII proceeding or investigation – is protected activity within the scope of § 704(a) based on the plain reading of the statute's text." *Deravin v. Kerik*, 335 F.3d 195, 204 (2nd Cir. 2003).

Based on foregoing, and given the broad protection afforded by the statutory language noted above ("participates in *any* manner in *any* investigation, proceeding, or hearing"), the Court is persuaded that Dr. Matus engaged in protected activity when participated in the January 11, 2013 meeting with Assistant Prosecutor Innes, Board Vice President Spreng and Deputy Commissioner Covell.

However, there is no legal support for the idea that Dr. Matus "participated in the investigation," when he called Mr. Charles, allegedly for the purpose of gathering information about the investigation.  Mr. Charles was in no way involved in the investigation and he was not even employed by the Health District.  His only connection to this case was that he was the ex-husband of Ms. Charles, who made the initial sexual harassment complaint. The idea that Dr.

42

Matus participated in the investigation when he contacted an individual with such a tangential connection to the sexual harassment claim is unsupported.

### b.    Causation.

Causation requires proof that the "protected activity was the determinative factor in the employer's adverse employment action." *Wholf v. Tremco, Inc.*, 26 N.E.3d 902, 912 (Ohio Ct. App. 2015).  Genuine issues of material fact persist regarding whether Mr. Matus was terminated for engaging in activity that was protected under the law.  Accordingly, neither Dr. Matus nor Defendants are entitled to summary judgment as to Mr. Matus's State law retaliation claim.

### 6.    Intentional Infliction of Emotional Distress.

To prove a claim of intentional infliction of emotional distress, a plaintiff must show that (1) the defendant intended to cause the plaintiff serious emotional distress; (2) the defendant's conduct was extreme and outrageous; and, (3) the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 71 Ohio St. 3d 408, 410, 644 N.E.2d 286 (1994).  "[S]erious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Paugh v. Hanks*, 6 Ohio St.3d 72, 78, 451 N.E.2d 759, 765 (1983).  A plaintiff may recover only where the defendant's "conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369, 375, 453 N.E.2d 666, 671 (1983).  "Generally, the case is one in which the recitation of

the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "'Outrageous!'" *Id.*

In the present case, Dr. Matus fails to describe evidence to show that Defendants intended to cause him serious emotional distress and the conduct complained of in this instance does not rise to the requisite level of outrageousness.  Accordingly, Defendants are entitled to summary judgment as to Dr. Matus's intentional infliction of emotional distress claim.

### V.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Docket #60) is hereby GRANTED IN PART AND DENIED IN PART.  Summary judgment is GRANTED in favor of Defendants as to Dr. Matus's First Amendment claim brought pursuant to 42 U.S.C. § 1983; his age discrimination and hostile work environment claims brought pursuant to Ohio Rev. Code § 4112.02; and, his claim for intentional infliction of emotional distress.  Summary judgment is DENIED with respect to Dr. Matus's claims for breach of employment agreement; breach of the implied duty of good faith and fair dealing; and, retaliation under Ohio Revised Code § 4112.02.

Dr. Matus's Motion for Partial Summary Judgment (Docket #56) is DENIED.

The Court, in its discretion, retains jurisdiction over Dr. Matus's supplemental state law claims pursuant to 28 U.S.C. 1367(c).

A trial remains set for February 10, 2016 at 8:30 a.m.  Trial order to issue.

IT IS SO ORDERED.

s/Donald C. Nugent_____
DONALD C. NUGENT
United States District Judge

DATED: January 15, 2016_____

44