UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL MATUS, M.D. | ) | CASE NO. 1:13 CV 01029 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| vs. | ) | |
| | ) | |
| LORAIN COUNTY GENERAL | ) | |
| HEALTH DISTRICT, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S TRIAL BRIEF

**With Appendix including (i) witness list;
(ii) exhibit list; (iii) proposed voir dire questions;
and, (iv) proposed jury instructions.**

---

David M. Cuppage (0047104)
dmcupp@climacolaw.com
Margaret M. Metzinger (0065624)
mmmetz@climacolaw.com
**CLIMACO, WILCOX, PECA,
TARANTINO & GAROFOLI CO., L.P.A.**
55 Public Square, Suite 1950
Cleveland, Ohio  44113
Telephone:  (216) 621-8484
Facsimile:  (216) 771-1632

*Attorneys for Plaintiff Paul Matus*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATEMENT OF CASE .................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 1

    A.   The Parties ........................................................................................................ 1

    B.   Background ....................................................................................................... 2

    C.   Defendant Pearce's Announcement of His Plan to Retire and to "Double Dip" Sets in Motion a Series of Events Leading to Plaintiff's Eventual Termination of Employment.. 3

    D.   Defendant Pearce's Reacts to the Contentious August 15th Board Meeting ...................... 5

    E.   Defendant Pearce Reports to the County Prosecutor's Office an Employee's "Uncomfortableness" ..................................................................................................... 8

    F.   Defendant Pearce, Enlisting the Board of Health, Launches an Unwarranted and Secret "Investigation" ......................................................................................................... 10

    G.   A So-Called Investigation! ............................................................................... 13

    H.   Having Baited Plaintiff to Defend himself, Defendants Retaliate Against Plaintiff for His Participation in the So-Called Investigation ................................................................... 22

LAW AND ARGUMENT ............................................................................................... 32

    A.   Plaintiff is Entitled to Judgment for Breach of Contract. ................................................. 32

            1.  Plaintiff's Agreement Is Enforceable ...................................................... 36

    B.   Plaintiff is Entitled to Judgment for Breach of Implied Duty of Good Faith and Fair Dealing. ........................................................................................................................ 37

    C.   Plaintiff Is Entitled to Judgment on His Claim for Retaliation Pursuant to Ohio Revised Code Section 4112.02(I). ............................................................................................... 41

    D.   Plaintiff is Entitled to Compensatory and Punitive Damages ........................................... 44

CONCLUSION ................................................................................................................ 47

APPENDIX ....................................................................................................................... 48

CERTIFICATE OF SERVICE ...................................................................................... 49

i

## INTRODUCTION

This case is about a well-known, highly regarded public figure in Lorain County, Ohio, Dr. Paul Matus, who was publicly maligned, harassed and embarrassed as a result of an intentionally misguided investigation of demonstrably false allegations of sexual harassment which eventually led to his wrongful termination. Dr. Matus was wrongfully subjected to an investigation, suspended and then terminated as the Health District's Medical Director in violation of the express terms and conditions of his employment agreement and in retaliation for participating in a hearing, proceeding and investigation where Plaintiff expressed various personal opinions about the Health District, the Health Commissioner and the misuse and unfair application of Health District's policies and procedures.

In the process, Plaintiff was subjected to retaliatory conduct, which caused him to suffer economic and non-economic damages for which he seeks compensatory and punitive damages (including reasonable attorney fees and other litigation costs and expenses).

## STATEMENT OF CASE

Plaintiff brings this case for breach of contract (Count 1 of the Amended Complaint), breach of implied duty of good faith and fair dealing (Count 2), and retaliation in violation of Ohio Rev. Code §4112.02(I) (Count 5).

## STATEMENT OF FACTS

### A.  The Parties

Plaintiff was the Medical Director of the Health District from 1991 to 2013[1]. Plaintiff is a medical doctor who has held numerous public and private positions throughout his career[2].

---

[1] *See Declaration of Paul Matus, M.D. ¶1 ("Matus Declaration") and Joint Stipulation ¶1.*
[2] *See Matus Declaration ¶1 and Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 1 for more detail.*

Defendant Lorain County General Health District (the "Health District") is a body politic established pursuant to a Contract for Union in accordance with Chapter 3709 of the Ohio Revised Code. *Joint Stipulation ¶2.* Defendant Ken Pearce is the former Health Commissioner of the Health District. *Joint Stipulation ¶3.* Defendant William Spreng is a member and Vice President of the Board of Health. *Joint Stipulation ¶4.* Defendant Dave Covell is the present Health Commissioner of the Health District. *Joint Stipulation ¶5.* The statutory legal counsel for the Health District is the Lorain County Prosecuting Attorney. *Joint Stipulation ¶6.*

### B.   <u>Background</u>

Since 1991, Plaintiff has been the Medical Director of the Health District. *See Matus Declaration ¶2, M.D. ¶1 and Matus Depo. Tr. at 15.* Prior to February 8, 2013, Plaintiff had <u>never</u> been the subject of any disciplinary proceedings at the Health District and Plaintiff had <u>never</u> received any written or verbal complaints about his performance as the Medical Director. *See Matus Declaration ¶2; Defendant Health District's Answers to Plaintiff's First Set of Discovery Requests, Answer to Request for Admission No. 1 ("Health District's Answers to Admissions").*

On July 8, 2009, Plaintiff and Defendant Health District entered into an Employment Agreement whereby the Health District contracted with Plaintiff to serve as the Medical Director pursuant to Ohio Revised Code §3709.11. *See Matus Declaration ¶3 and Joint Stipulation ¶8, Exhibit 2.* Pursuant to the Employment Agreement, Plaintiff was to provide the Board various services commencing March 31, 2009 "for an indefinite and continuing term to serve as the Medical Director of the Health District." *Id.* The Employment Agreement "may be terminated by either party for cause at any time, with thirty (30) days written notice. 'Cause' shall mean, but not be limited to breach or neglect of duty, violation of any law, dishonesty, insubordination, or

2

gross misconduct." In addition, the Health District's Personnel Policy provides for a "progressive discipline" procedure and further identifies Group I, II and III Offenses, with only Group III Offenses being grounds for "first offense" termination. *See Joint Stipulation ¶¶9-10, Exhibit 4.*

### C.  Defendant Pearce's Announcement of His Plan to Retire and to "Double Dip" Sets in Motion a Series of Events Leading to Plaintiff's Eventual Termination of Employment

On July 25, 2012, at a regularly scheduled Board meeting, Defendant Pearce announced his intention to retire on a date which would likely be at the end of August or September 2012. *See Declaration of Paul Matus, M.D. ¶5 and Joint Stipulation ¶13, Exhibit11.* Defendant Pearce explained that his decision to retire was made due to certain revisions to the State's Public Employee Retirement System ("OPERS"). *See Deposition of Ken Pearce, at 23, 29.* During this July 25th meeting, some members of the Board expressed a desire to retain Pearce as Health Commissioner. Other members of the Board, including Plaintiff's brother-in-law, Edward von Hofen, who was the President of the Board, expressed their views privately that it would be inappropriate for Pearce to retire, collect his pension, and at the same time be rehired and paid by the Board of Health. *Matus Declaration ¶6.*

On August 15, 2012, the issue of Defendant Pearce's pending retirement and retention as Health Commissioner was discussed and debated during a contentious executive session of the Board. *See Matus Declaration ¶7 and Joint Stipulation ¶14, Exhibit13.* During this executive session, Mr. von Hofen, asked Defendant Pearce and the Assistant County Prosecutor Ben Davey to step out of the meeting. *Deposition of Ken Pearce, at 45; Deposition of Vivian McCullough at 11-12.* Both Pearce and Davey appeared to be very angry and agitated at having been asked to leave the executive session. Thereafter, Plaintiff learned that during the executive session, Mr. von Hofen took the lead in opposing the re-hiring of Defendant Pearce due to the perceived

3

impropriety of allowing Defendant Pearce to "double dip." *See Matus Declaration ¶7; McCullough Depo. Tr. at 11-12.* Ms. McCullough acknowledged there was resistance from some board members and in particular from Ed von Hofen. *Id.* Ms. McCullough was personally upset about the dissension, the negativity of the other board members. *Id. at 14.* After Plaintiff's brother-in-law expressed his views, Defendant Pearce, along with Assistant County Prosecutor Ben Davey, re-entered the executive session and Mr. von Hofen was asked to (and did) leave the executive session. *See Matus Declaration ¶7 and Deposition of Ken Pearce, at 49.*

Following the executive session, a resolution was passed at the public meeting for a Contract for a Transitional Health Commissioner and the Board specifically instructed the Health District's legal counsel to draft a contract for Defendant Pearce as the Transitional Health Commissioner to be placed into effect on October 31, 2012 for such term as discussed (but not revealed in any minutes of the public meeting) and to be terminated upon the selection of a new Health Commissioner. *See Joint Stipulation ¶14, Exhibit 14.* With Defendant Pearce's announced retirement came the task of searching for his replacement.

Defendant Pearce and Defendant Spreng, as well as other Health District employees, believed that Plaintiff would be a viable candidate to immediately replace Defendant Pearce as Health Commissioner without any transition being required. *See Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 6.* However, Plaintiff had no interest in becoming the Health Commissioner but had a brief discussion with the then acting interim Health Commissioner, Pat Schrull, in which Plaintiff indicated that he would be willing to serve on an interim basis. *See Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 5.* Plaintiff had this conversation with Pat Schrull after she

4

indicated that she was overwhelmed, did not want the job, and did not know what to do as interim commissioner. *Id.*

### D. Defendant Pearce's Reacts to the Contentious August 15th Board Meeting

Following the August 15th Board meeting, Defendant Pearce met with Board Members, Defendant Spreng and Vivian McCullough at a McDonalds restaurant. *Deposition of Ken Pearce, at 49.* Defendant Pearce was told and understood in general terms that there were some objections to his returning as Health Commissioner. *Id.* Defendant Spreng told Pearce that McCullough felt Pearce was not treated appropriately. *Id. at 50.* In fact, Pearce knew that "Vivian was pretty upset." *Id. at 52.* Pearce suspected there was a significant split on the Board and speculated that von Hofen, Plaintiff's brother-in-law, may have been one who voiced objections to his return as Health Commissioner. *Id at 50-51.*

Defendant Pearce held a meeting on the day following the board meeting with numerous staff members, including Tonya Kollen, Joyce Davis, Pam Weiland, Barb Kowalski, Stephanie Charles and Raymond Romero, at which time he advised them that the "meeting did not go well." See *Deposition of Tonya Kollen, at 10-12.* According to Ms. Kollen, Defendant Pearce discussed with her what had happened at the executive session the day before and that he indicated that he would be returning on an interim basis in approximately two months. *Id., at 14.* It was also during this meeting that Defendant Pearce gave the staff members very curious but specific instructions that, during the two month period in which he would be gone, no one was to contact the Medical Director or legal counsel, except Tonya Kollen or Joyce Davis. *Id., at 14-15.* Prior to this August 16th meeting, there were no restrictions on who at the Health District was able to contact the Medical Director or legal counsel. *Id., at 16.*

These instructions were particularly upsetting to the Director of Nursing Tanas Wilcox. *See Deposition of Tanas Wilcox, at 23*. Ms. Wilcox's relationship with Defendant Pearce had been very troubling since 2009 when Defendant Pearce, who was on a cruise at the time, directed Raymond Romero and Stephanie Charles to instruct other employees of the Health District to input Tanas' name into a computer verification system which verified that she was present when H1N1 immunizations were given to the public, when in fact she was not present. *Id. at 16-20*. Ms. Wilcox complained to the Health District's legal counsel, Scott Serazin, who initially agreed with Ms. Wilcox that it was improper for Health District employees to verify that she was present during the immunizations when she was not. *Id. 17*. When Defendant Pearce returned from a vacation, however, Defendant Pearce refused to meet with Tanas and Mr. Serazin and flatly told her that "I can do whatever I want, I am the health commissioner." *Id*.

August 16, 2012 was only the beginning of a "crazy week." *See Wilcox Depo. Trans. Page 24-36*. The next day, August 17, Defendant Pearce met again with Ms. Wilcox. During this meeting, Defendant Pearce advised Ms. Wilcox that he had just met with Board of Health members Vivian McCullough and Defendant Spreng. *Id. at 25-26*. Defendant Pearce told Ms. Wilcox that he had been given the assignment by the Board "to clean house [and] that my name had been brought up." Defendant Pearce then "got really threatening," and told Ms. Wilcox that "he was going to walk out of there [the Health District] with nearly 1.5 million dollars and he was going to be able to come back for like $80,000. That there was some board members rallying to bring him back." *Id*.  Defendant Pearce then told Ms. Wilcox that "they want to fire you, but I told them I wouldn't do that. You know, that I'm going to work through Tonya and Joyce though to, you know, make my life miserable." *Id*.  In fact, Stephanie Charles confirmed that Defendant Pearce wanted to fire Ms. Wilcox. *Stephanie Charles Depo. at 45*.

6

Later, on August 21st, according to Ms. Wilcox, Defendant Pearce walked into her office, closed the door, and told her "things had got worse." *Wilcox Depo. at 28.* This time, Defendant Pearce told Ms. Wilcox that he "could make me classified and that the board was upset with him and that he wanted to protect me." *Id; see also Deposition of Ken Pearce, at 57.* Defendant Pearce proceeded to "ramble" about how the Board was still upset with her, but that he could "protect" her. *Id. at 29.* Defendant Pearce also told Ms. Wilcox that Plaintiff was "going around lying about me" and that Plaintiff was "politicking" for the Health Commissioner job. Ms. Wilcox knew, however, that Plaintiff was not interested in the job.  Defendant Pearce then threatened Ms. Wilcox about "redemption." When she asked, "redemption for what?" Defendant Pearce "just continued to ramble." *Id.*

The next day, August 22nd, Defendant Pearce again told Ms. Wilcox that he "could protect me by changing my classification" but that "he needed to know what I was willing to do to do that." *Wilcox Depo. at 30-31.*  Defendant Pearce again asked her, "what are you willing to do?" *Id. at 31.* Defendant Pearce added that Board members Bill Spreng and Pat Schull needed to be "persuaded and that the Board was moving ahead with the firing." *Id.* Throughout these discussions, Mr. Pearce frequently used the term, "quid pro quo." *Id.*

The next day, August 23rd, Defendant Pearce berated Ms. Wilcox in front of Joyce Davis, about the Drug Repository program. Defendant Pearce then excused Ms. Davis, and advised Ms. Wilcox that "I am to take care of you, and they [the Board] will take care of Dr. Matus. And I'm going to be here for six months." Defendant Pearce then pulled his finger across his throat in a slicing gesture and said, "take care of you." Ms. Wilcox got physically sick at the site of Defendant Pearce's gesture. Defendant Pearce concluded this episode by reminding Ms. Wilcox that "they need to clean house," he would make more money, and the "prosecutor's office will

7

straighten everything out later." *Id. at 33.* Ms. Wilcox then contacted her attorney and had no

further conversations with Defendant Pearce. *Id.*

### E. Defendant Pearce Reports to the County Prosecutor's Office an Employee's "Uncomfortableness"

On or about August 22, 2012, one week after the contentious executive session,

Plaintiff's Employment Agreement was faxed from the Health District to the County

Prosecutor's Office. *See Matus Declaration ¶9 and Joint Stipulation ¶15, Exhibit 2.*

Thereafter, on August 28, 2012, Defendant Pearce delivered a letter to Assistant County

Prosecutor Benjamin Davey in which Defendant Pearce reported an alleged conversation with a

female staff member, Stephanie Charles, during which the question of Defendant Pearce's

replacement was discussed[3]. *See Matus Declaration ¶10 and Joint Stipulation ¶17, Exhibit 17;*

*Deposition of Ken Pearce, at 35.* During this conversation, which allegedly took place on August

6, 2012, Defendant Pearce reported that the female staff member, while instructing Plaintiff on

how to access and use the "Emergency Alertfind" program on her small laptop computer felt

"very uncomfortable with Dr. Matus" because Plaintiff "sat uncomfortably close to her" and had

an alleged "conversation of a personal nature." Although the female staff member reported that

there was no physical contact between her and Plaintiff, and that she did not want to make a

formal complaint[4], Defendant Pearce made a report. *Deposition of Ken Pearce, at 41.* The

---

[3] Defendant Pearce testified that Ms. Charles brought up the subject of Dr. Matus replacing Defendant Pearce as Health Commissioner. Pearce *Depo. Tr. at 35.* Ms. Charles testified it was Defendant Pearce that mentioned Dr. Matus was interested in the position. *See Stephanie Charles Depo. Tr. at 26-27. In any case,* Defendant Pearce testified that Dr. Matus never indicated to him that he was interested in replacing him. *Pearce Depo. Tr. at 37.*

[4] Defendant Pearce has investigated actual complaints of work place harassment without going to legal counsel, including incidents involving Mr. Romero, who was allegedly present when Ms. Charles made her report about Plaintiff. *Deposition of Ken Pearce, at 72.* In responding to an actual complaint, Defendant Pearce met with Mr. Romero who acknowledged that he had made inappropriate comments about another female employee on a social network site during work hours. Mr. Romero agreed to not post anything further and to apologize to the female employee. *Id.* Defendant Pearce also testified no

female staff member indicated that she did not want Defendant Pearce to "respond because of her personal relationship with another Health District staff member and due to her past history of divorce."  Nevertheless, Defendant Pearce allegedly reported the matter to Assistant Prosecutor Davey and Defendant Spreng. *Deposition of Ken Pearce, at 44.*  Significantly, Defendant Pearce failed to report to Assistant Prosecutor Davey that the alleged incident occurred 16 to 17 months previously, in March or April of 2011. *Deposition of Ken Pearce, at 40.*

Plaintiff did not engage in a conversation of a personal nature with the female staff member. *See Matus Declaration ¶11.*  To the contrary, Plaintiff sat next to Stephanie Charles in an open conference room while she provided instruction on how to access and use the Health District's "Emergency Alertfind" program on her small lap top computer. Plaintiff sat near enough to the computer screen to read the screen and understand the instructions. *Id.; see Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.* The session lasted only a few minutes. Plaintiff sat next to Stephanie Charles in an open conference room. At no time did Ms. Charles ask Plaintiff to move away from her or indicate that he was somehow invading her space or sitting uncomfortably close to her. At no time did she appear to Plaintiff to be offended or uncomfortable. *See Declaration of Paul Matus, M.D. ¶11.*

In fact, Stephanie Charles had limited workplace interaction with Plaintiff and testified that she had only worked briefly with Plaintiff on two projects. *Stephanie Charles Depo. at 19-20.* Ms. Charles testified that, after Mr. Pearce mentioned Plaintiff was interested in the Health Commissioner position, she stated she wouldn't want to work with Plaintiff because he made her

---

female employee has ever complained to him about male employees paying compliments to female employees and that he "has certainly paid female employees compliments at work," although he "avoided that as much as possible." *Id. at 74-75.* Finally, Defendant Pearce had received a complaint about Ms. Charles and Mr. Romero attending overnight seminars together and, knowing full well that they were romantically involved, instructed Tonya Kollen that "we should avoid sending Raymond and Stephanie to any overnight events in the future." *Id.*

"uncomfortable." *Stephanie Charles Depo. at 28-29.* Ms. Charles never used the word "inappropriate." *Id.* She did not lose any sleep over the "incident," which did not affect her ability to come to work, and she did not ask Mr. Pearce to conduct an investigation or even suggest that Plaintiff had done anything wrong or that he should be investigated. *Stephanie Charles Depo. at 30-31.* When asked whether, "on its own, you would agree with me, there was really nothing to investigate?" Ms. Charles answered, "I suppose not." *Stephanie Charles Depo. at 42.* Importantly, Ms. Charles observed, based solely on "Ken's tone," that there "seemed to be animosity between Ken Pearce and Matus." *Stephanie Charles Depo. at 44.*

During this time period, reports of Defendant Pearce's plan to "double-dip" began to circulate and receive unfavorable attention in the press and media. *See Declaration of Paul Matus, M.D. ¶12 and Joint Stipulation ¶18, 19, 21, Exhibits 17, 18, 20.* Defendant Pearce was aware of the newspaper articles about his "double dipping," and acknowledged that the quotes attributed to him were "very close quotes." *Deposition of Ken Pearce, at 59.* In fact, when he read the articles, he determined at that time, that he was not returning, although he did not tell anyone of his decision to not return. *Id.*

### F.   Defendant Pearce, Enlisting the Board of Health, Launches an Unwarranted and Secret "Investigation"

Perhaps due to the unfavorable press attention and the subject of an investigation, the Lorain County Prosecutor Dennis Will, Assistant County Prosecutor Gerald Innes and Assistant County Prosecutor Ben Davey were scheduled to attend the September 12, 2012, Board meeting. *Declaration of Paul Matus, M.D. ¶13.* Because of their expected attendance and the concomitant anxiety that this unusual development evoked, Plaintiff was asked by his brother-in-law to attend the executive session. During the executive session, the County Prosecutor's Office, lectured and attempted to intimidate the Board Members about maintaining confidentiality of executive

10

session discussions and presented each Board Member and Plaintiff with a Notice of Non-Disclosure of Confidential matters. Plaintiff was also asked to sign this Notice, which he did. Plaintiff was then asked to leave the executive session, which he did. Plaintiff since learned through his participation in the Pre-Disciplinary Hearing, that after he was dismissed from the executive session, the Board discussed "disciplinary matters" during which time it was revealed to the Board that "very serious allegations of sexual harassment" purportedly had been made against him. *Id.*

Ms. McCullough, however, testified that no facts were presented to the Board about the allegations, no names were given, and that she did even not know who was involved. *McCullough Depo. Tr. at 34-35.* She had no idea what had happened other than somebody said something. *Id.* Most importantly, the Board was not provided a copy of Pearce's letter to Davey. *Id. at 39-40.* Defendant Spreng testified that the Board was told that "several staff members felt uncomfortable around Dr. Matus and that he had said some inappropriate things." *Spreng Depo. Tr. at 40-41.* The Board was lead to believe that Dr. Matus had made sexually suggestive comments, although they were not given, nor did they ask for, a lot of detail. *Id.* Mr. von Hofen testified that the Board never saw written allegations made against Plaintiff, they were not told the identity of the complainant, they were not given the specifics, such as where the incident occurred, when it occurred, or any information as to the nature of the incident. *von Hofen Depo. Tr. 43-44.* In other words, the Board had no specific facts relevant to the allegations when the board ultimately voted to conduct an investigation. *Id. at 61.*

Following the executive session, and without inquiring into the nature of the allegations made against Dr. Matus or when the purported harassment took place, the Board passed a resolution to hire Clemans, Nelson and Associates, Inc. ("CNA") to "revise and update the

agency's personnel policies and investigate employee matters." It was also "mentioned [but only in the resolution] that all employees are directed to cooperate with the investigation." No additional details of the investigation were made public and neither the subject nor the target of the investigation was revealed. *See Declaration of Paul Matus, M.D. ¶14 and Joint Stipulation ¶20, Exhibit 19.*

Although the Health District authorized the hiring of CNA to conduct an investigation of alleged harassment, Plaintiff was not advised or informed at this time that allegations were asserted against him on or about August 6, 2012, or that reports were made on August 20, 2012 and August 28, 2012 by Defendant Pearce, or that Plaintiff was the subject of an investigation. *See Declaration of Paul Matus, M.D. ¶15.*

Although Ms. Charles did not want to report the alleged incident, Defendant Pearce, Defendant Spreng and Assistant County Prosecutor Gerald Innes justified the retention of CNA to conduct an investigation due to Plaintiff's age, his well-known and well-respected reputation and his stature in the community, and because, as was claimed at the Pre-Disciplinary Conference (to be discussed later), the Health District was and is a "public body in the era of Penn State." *See Declaration of Paul Matus, M.D. ¶17; See Spreng Depo. Tr. at 49.* By making references to "Penn State," Innes and Spreng intentionally made an excessive and offensive exaggeration and a false and defamatory statement by comparing an allegation of "sitting uncomfortably close" to another staff member (which does not fit the definition of sexual harassment under the Board's own policies) to allegations of child rape. *Matus Declaration, ¶17.* In fact, Mr. Speng acknowledged that raising the specter of Penn State could give an inference that children were being harmed. *Spreng Depo. Tr. 49.*

12

The next day, September 13, 2012, Plaintiff's brother-in-law informed him that he could no longer talk to Plaintiff. Even though Mr. von Hofen testified that he did not believe the allegations (and doesn't to this day), *see von Hofen Depo. Tr. 42,* that was the last day Plaintiff's brother-in-law spoke with Plaintiff. *Declaration of Paul Matus, M.D. ¶16.*

    **G.**    **A So-Called Investigation!**

On October 9, 2012, after Defendant Pearce had retired from the Health District, Defendant Pearce and others met with representatives of CNA to, among other things, "discuss the conduct of an investigation of the alleged inappropriate conduct of the Medical Director." *Joint Stipulation ¶22; Conley Depo. Tr. 19.* Later, on October 26, 2012 and November 5, 2012, CNA conducted interviews with one former and four current Board of Health - Health Educators. *Conley Depo. Tr. at 17, Exh. 2, CNA File and Interview Notes (CNA 1 through 60).* Ms. Conley interviewed Ali Carigio, Stephanie Charles, Laura Baus-Fenik (a former employee), Sara Warner and Katie Bevan. *Conley Depo. Tr. at 30.* Although Ms. Conley considers the Equal Employment Opportunity publications "authoritative" on the subject of work place investigations, she did not recall consulting any types of handbooks, manuals, articles or other literature on the subject of conducting investigations. *Conley Depo. Tr. at 31-32.*

Notwithstanding that the Board had been advised that "very serious allegations of sexual harassment" had been made against Plaintiff, Ms. Conley stated that, because Ms. Charles did not make a complaint of sexual harassment, but rather made a complaint of "inappropriate conduct," see *Conley Depo. Tr. at 52,* she was actually investigating "inappropriate conduct that could arise to the level of potential sexual harassment." *Conley Depo. Tr. at 52.* Ms. Charles reported to Ms. Conley that others had "experiences" with Dr. Matus and, based on Ms. Charles report, she determined she should interview those women as well. *Conley Depo. Tr. at 54 and*

*94.* In other words, of the 58 female staff members[5] working at the Health District, Ms. Conley interviewed only those women who were handpicked by Assistant County Prosecutor Ben Davey and had been referred to him by Ms. Charles. *Id. at 94.* To make matters worse, Ms. Conley testified that some of the women she interviewed were already aware that an investigation was going on and that they would be contacted to discuss Dr. Matus. *Id. at 101.*

During her interview, Ms. Cariglio reported to Ms. Conley that Dr. Matus had paid her compliments at work but that she was "comfortable" around Dr. Matus. *Conley Depo. Tr. at 46.* Ms. Conley failed to ask Ms. Cariglio whether any other male employees ever paid her compliments at work[6]. *Id. 45.* In fact, Ms. Conley failed to ask any interviewee whether they had experienced behavior from other male employees as they alleged to have experienced with Dr. Matus. *Conley Depo. Tr. at 86.* As a result, Ms. Conley had no facts to compare Dr. Matus' alleged inappropriate conduct with other male employees of the Health District.

After Ms. Charles reported that other women had similar experiences with Dr. Matus, Ms. Conley interviewed Ms. Baus, Ms. Warner and Ms. Bevan. Ms. Baus, who was aware of the investigation before the meeting, advised Ms. Conley that Dr. Matus "was not a sexual harasser." *Conley Depo. Tr. at 61.* Ms. Baus, a former employee of the Health District (who had ceased being an employee in 2008!), advised Ms. Conley that she was aware that something was going on which concerned Dr. Matus and that someone was "upset" at Dr. Matus. *Conley Depo. Tr. at 61.* Ms. Baus advised Ms. Conley that she knew this from "get togethers" with other women

---

[5] Ms. Conley could not testify as to the exact number of employees. As of November 2012, Health District records indicate there are 58 female employees and 11 male employees.

[6] In fact, Ray Romero readily acknowledged that he has paid female staff members compliments at work. *Romero Depo. Tr. at 31-32.* Romero has complimented Ms. Charles (not surprisingly), Tonya Kollen, Debbie and Sara, but he "really doesn't keep track of things like that." *Id.* According to Mr. Romero, no one has ever complained. *Id.* So too has Ken Pearce, who testified that, while "I avoid that as much as possible," "Oh, certainly. I probably have at one point. Yes." Pearce Depo. Tr. at 74-75.

from the Health District but Ms. Conley failed to follow up with Ms. Baus to ask who. *Conley Depo. Tr. at 61.*

Ms. Baus also advised Ms. Conley that Ms. Charles "is upset," "upset in a bunch," a "different kind of girl," "opportunistic," "could exaggerate or put someone else on [the] line," and that there was "lots of controversy in her." *Conley Depo. Tr. at 63.* Ms. Baus advised Ms. Conley to "look carefully at the source," since Ms. Charles had an affair with another co-worker[7] and that Ms. Baus questioned Ms. Charles' character. *Conley Depo. Tr. at 64.* Ms. Conley had no reason to believe Ms. Baus was not telling the truth. *Id. at 64-65.*

Ms. Baus was not the only employee interviewed who openly questioned the so-called investigation. Ms. Bevan openly questioned Ms. Conley and asked about the timing of the investigation, asking Ms. Conley, "why now?" *Conley Depo. Tr. at 70.*

Even though one witness openly questioned the integrity and character of Ms. Charles and another openly questioned the timing of the investigation, Ms. Conley' failed to mention any of these facts in any written report or verbal report to any Board of Health representative. *Conley Depo. Tr. at 84.* Instead, Ms. Conley's report reflects that the "reporting employee," "affirmed that neither inappropriate touching nor physical contact occurred, but indicated that she felt that the Medical Director was sitting too close, that she was uncomfortable at the time, and that she perceived this as an invasion of personal space, or invasion into space reserved only for family members. She was not quite sure however that the Medical Director even noticed he was that close." *Conley Depo. Tr. at 38; Joint Stipulations, ¶28, Exh. 27.* Ms. Conley reported that other interviewees acknowledged no specific incidents of what they would consider "inappropriate

---

[7] Although Ms. Conley did not interview Ray Romero, had she done so, she would have been told in no uncertain terms that he has referred to Ms. Charles as "a drama queen," and that she "is a little more high strung." *Romero Depo. at 31.*

conduct" or "sexual harassment," but that the Medical Director "did conduct himself differently than other male professionals[8] within the Department." They did not perceive such actions as "inappropriate, threatening or harassing, but Ms. Conley reported[9] that they did represent such actions as 'overly flirtatious,' 'creepy,' 'weird' or 'awkward'." Such actions, however, did not "rise to the level of making them uncomfortable" and "they did not take offense." *Joint Stipulations, ¶28, Exh. 27.*

In her actual report, Ms. Conley concluded, and so reported, that "this conduct" is viewed by some as the "personality" of the Medical Director and that "perhaps a generational difference may exist with the female health educators being in their twenties and [early] thirties and the Medical Director being in his early sixties." (Emphasis supplied.) *Joint Stipulations, ¶28, Exh. 27.* Ms. Conley testified that it was Ms. Bevan who posited that there might be generational differences. *Conley Depo. Tr. at 88.* As a management consultant, however, Ms. Conley is aware that some organizations "struggle" with "generational differences in the work place" and that others have "challenges," *Conley Depo. Tr. at 89,* the most common being work ethic and commitment, and then technology in the workplace. *Id.*

The so-called investigation into Plaintiff's alleged "inappropriate behavior" violated essentially every standard, common practice, procedure and guideline readily and easily available to human resource professionals, management consulting firms and legal

---

[8] Dr. Matus is the only male professional over the age of 50 (aside from Ken Pearce) within the Department. Ms. Conley was clearly never advised about the complaints made against Ray Romero and Bob Goard. *See Depo. Tr. Ken Pearce at 74-75 and Tonya Kollen, at 32-33(Mr. Goard was accused by two female employees of sexual harassment including brushing up against one). Nor was she aware of Mr. Pearce's admissions about complimenting female employees.*
[9] Ms. Conley's report does not accurately reflect the notes of her interviews. *See Conley Exhibit 2 and compare to Expert Report of Susan S. Case, PH.D, Exhibit Appendix B, Table 2, a copy of which is being filed herewith.*

16

professionals.[10] The most common and accepted standards, practices, procedures and guidelines are available on-line and published by the United States Equal Employment Opportunity Commission (the "EEOC").[11]

During the course of the CNA "investigation," Plaintiff was never advised by the Health District that a "complaint" was made against him, that he should refrain from having contact with anyone who may have complained, that he must refrain from taking any retaliatory actions against anyone who made a "complaint," and he was never given an opportunity to respond to the "complaint." He was never asked any of the questions recommended by the EEOC. *See Declaration of Paul Matus, M.D. ¶19; Health District's Answers to Admissions Nos. 8 and 9.* Defendant Spreng claimed to have assumed that Plaintiff was interviewed, as he was "shocked" that Dr. Matus was not interviewed. *Spreng Depo. Tr. 50.* Mr. von Hofen also expected that Plaintiff would have been interviewed. *von Hofen Depo. Tr. 64.*

Moreover, because the investigation was not "prompt, thorough or impartial," and because CNA actually interviewed an employee who had resigned from the Health District <u>four years</u> earlier, the investigation was allowed to become the subject of rumors, gossip and

---

[10] *See* for example, the U.S. Equal Employment Opportunity Commission (the "EEOC") has published a brochure captioned, "Questions and Answers for Small Employers on Employer Liability for Harassment by Supervisors." The brochure described how an employer should investigate a harassment complaint, page 3, by stating that "an employer should conduct a prompt, thorough and impartial investigation," "the investigator should interview the employee who complained of harassment, the alleged harasser, and others who could reasonably be expected to have relevant information." In addition, the EEOC has published another brochure captioned, "Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors." This brochure, at page 12-15, details an "Effective Investigative Process" and provides sample questions to ask the complainant, as well as the alleged harasser and third parties. *See Health District's Answers to Admissions No. 2.*

[11] It is also pointed out by the EEOC in its Enforcement Guidance that "the anti-discrimination statutes are not a 'general civility code.' Thus, federal law does not prohibit simple teasing, offhand comments, or isolated incidents that are not 'extremely serious.' Rather, the conduct must be 'so objectively offensive as to alter the 'conditions' of the victim's employment." *Health District's Answers to Admissions No. 3 and 4.*

speculation amongst the Health District's past and present employees. *See Declaration of Paul Matus, M.D. ¶20.*

Ms. Conley acknowledged that confidentiality of the investigation is intended to also protect the accused against unfounded allegations of sexual harassment and to protect the accused from retaliation. *Conley Depo. Tr. at 100.* Further, she agreed that the EEOC specifically indicates that it is management's responsibility to remind the parties, including the accused, about the prohibition against retaliation. *Conley Depo. Tr. at 101-103.* Although she was charged with conducting the interviews on behalf of management, she denied that she would have been responsible for reminding Dr. Matus about the prohibition against retaliation. *Id. at 104,* even though the EEOC states it is the official who conducts the interview who is to remind the parties about the prohibition against retaliation.

Thus, in early November through December 2012, Plaintiff and his wife (who is also a Health District employee) both began to recognize subtle changes in the workplace atmosphere. Employees began treating each of them differently. *See Declaration of Paul Matus, M.D. ¶21; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 14; Matus Depo. Tr. 29-30.* They were avoided by employees who were usually friendly and who previously engaged in conversation with them. *Matus Depo. Tr. 29-30.*

Then, on December 8, 2012, Plaintiff received a phone call from Laura Baus (a former employee of the Health District) who informed Matus that she was interviewed by someone from CNA about allegations of sexual harassment. *See Declaration of Paul Matus, M.D. ¶22; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.* Plaintiff was informed that Baus had asked the woman from CNA whether he was aware of the allegations. *Id.* Baus informed Matus that she was informed he was not and that she had also told

18

the investigator that CNA should interview Kim Polen who would know more about Stephanie Charles' reputation. *Id.; see also Matus Depo. Tr. at 29-30.*

After having spoken with both Ms. Baus and Ms. Polen, Plaintiff began to experience outright panic, distress and confusion believing that his good name and reputation were being tarnished by allegations of which he had no knowledge, understanding or confirmation from the Health District.  Plaintiff had never before been accused of sexual harassment and no employee had ever complained to him about his conduct at work or otherwise. Further, Plaintiff had very little to no involvement with Stephanie Charles and could not understand why she may have been someone who, he was told, may be "behind" the allegations. Finally, Plaintiff could not understand why he was never interviewed or given the opportunity to defend himself against allegations made against him, as is customary and required by the EEOC. *See Declaration of Paul Matus, M.D. ¶24.*

Thereafter, on December 10, 2012, Plaintiff asked Tonya Kollen whether anything was going on about him in the Health Department because he sensed something was wrong. Plaintiff asked a few additional questions and told her he felt really uncomfortable and was nervous that something was going on which involved him. Tonya responded that she wasn't aware that anything was going on. *See Declaration of Paul Matus, M.D. ¶25.*

On December 12, 2012, the CNA investigation was discussed by the Board of Health during executive session. *See Joint Stipulations, ¶29, Exhibit 28; Deposition Transcript of David Covell, at 20.* As was the case when the Board was not given Defendant Pearce's letter to Davey, the Board was not given a copy of the CNA Report. *McCullough Depo. Tr. at 40.* Mr. Spreng testified that as of December 12, 2012, the investigation had concluded, but that Dr. Matus had not been told and should have been told that the investigation was over. *Spreng Depo. Tr. at 54.*

Mr. von Hofen also understood that as of December 12, 2012, the investigation was "done; it was completed." *von Hofen Depo. Tr. 84-85.*

Prior to the executive session, Covell spoke with Sandra Conley and was verbally advised that the results were going to state that the activities regarding Matus did not rise to the level of sexual harassment but that it was considered more of a "sensitivity issue." *Covell Depo. Tr. at 17.* Covell planned on discussing the matter with Plaintiff. *Id.* During the executive session, Assistant County Prosecutor Innes gave a report on the subject of the CNA investigation. *Id. at 20.* The Board then instructed Covell to confirm the "preliminary" results and then advise Matus as to those preliminary results. *Id.* This was the first time the Board ever instructed anyone to advise Matus about an investigation. *Id. at 28.*

Also, on December 12, 2012, following the Board meeting, Plaintiff attempted to discuss with Assistant Prosecutor Innes whether an investigation of him was underway and, if so, what the basis was for the investigation. *See Declaration of Paul Matus, M.D. ¶26; Joint "Stipulation ¶32; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.* Assistant Prosecutor Innes refused to confirm or deny the existence of an investigation, stating only that "there have been complaints." *Id., see Matus Depo. Tr. at 62-63.*

On or about December 13, 2012, CNA faxed to assistant Prosecutor Innes a document captioned, "Memorandum [of] Investigation of Complaint LCGHD Medical Director" (hereinafter, the "Memorandum of Investigation"), *see Joint Exhibit 31,* in which it was clearly revealed that the "interviews did not establish evidence of sexual harassment on the part of the Medical Director" and that "generational differences may exist with the female health educators being in their twenties and thirties and the Medical Director being in his early sixties.**"**

On December 14, 2012, Plaintiff attempted to discuss with Defendant Covell whether an investigation was underway, and, if so, what the basis was for the investigation. *See Declaration of Paul Matus, M.D. ¶27; Joint Stipulation ¶32 and 33, Exhibit 32; Matus Depo. Tr. at 64-67; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 8; Covell Depo. Tr. at 29-33.* The conversation took place in a parking lot outside a restaurant after a "get to know you" lunch, nearly two and half months after Covell became employed at the Health District. During the meeting with Covell, Plaintiff specifically asked Covell whether there was an investigation and, if so, what he was being accused of doing. Covell was very evasive in answering Plaintiff's direct questions but otherwise stated that unidentified "women had complained," that "it was almost over," and that he and Joyce Davis had a conversation about comments Plaintiff had allegedly made about "who should or should not have babies." Plaintiff told Covell during this conversation that he never made any statements about "who should or should not have babies."  Covell also told Plaintiff that Plaintiff should "just wait." Covell indicated that he thought the Board would talk to Plaintiff. *Declaration of Paul Matus, M.D. ¶27.*

Notwithstanding the fact that the Memorandum of Investigation revealed that "interviews did not establish evidence of sexual harassment on the part of the Medical Director" and that "generational differences may exist with the female health educators being in their twenties and thirties and the Medical Director being in his early sixties," Defendant Covell failed to advise Plaintiff of any of the allegations asserted against him and failed to inform Plaintiff that the investigation was over, with no findings of improper behavior. *See Declaration of Paul Matus, M.D. ¶28; Matus Depo. Tr. at 67.* Instead, Defendant Covell stated that "sensitivity training" was in order. *Covell Depo. Tr. at 31.* Defendant Covell later reported Plaintiff "was willing to do whatever is necessary to put this behind us." *See Joint Stipulation No. 33,  Exhibit 32.* Covell

claims to have told Plaintiff the investigation was over, but also referred to the results as "preliminary" and acknowledged that he advised Plaintiff that once the "entire" investigation was reported to the Board, he would have further conversation with Plaintiff. *Covell Depo. Tr. at 33.*

### H. Having Baited Plaintiff to Defend himself, Defendants Retaliate Against Plaintiff for His Participation in the So-Called Investigation

After this discussion with Covell, Plaintiff believed he would be given more information before the next regularly scheduled Board meeting set for January 9, 2013. However, no further information was forthcoming and, as the Board meeting began to approach, Plaintiff began experiencing more distress in believing that he would be expected to address the Board and potentially have to defend himself and his actions without being provided any information about the allegations made against Plaintiff. *See Declaration of Paul Matus, M.D. ¶29.*

In order to be prepared to address any allegations being made against him, on January 6, 2013, Plaintiff made a phone call to Stephanie Charles's ex-husband, David Charles, *Joint Stipulations, ¶34,* in order to find out whether Mr. Charles knew of any allegations of sexual harassment being lodged against him and whether Stephanie Charles would be "the type of person who would make up lies about another person." *See Declaration of Paul Matus, M.D.* Mr. Charles advised Plaintiff that he was not aware of any allegations. In answer to the last question, Mr. Charles responded, "not the Stephanie that I know." The conversation regarding Stephanie Charles lasted no longer than a few minutes, although Dr. Matus and Mr. Charles discussed other matters unrelated to Mrs. Charles or the Health District. Plaintiff did not and would not make any derogatory statements to Mr. Charles about Stephanie Charles or anyone at the Health District. *See Declaration of Paul Matus, M.D. ¶30; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 10; Matus Depo. Tr. 44-46.*

Mr. Charles testified that Plaintiff called him and asked if Stephanie "was a woman of integrity, would she ever fabricate a case." *David Charles Depo. Tr. 13-14*. While Mr. Charles was annoyed by the phone call, Mr. Charles confirmed that Plaintiff did not refer to Ms. Charles as a liar, as being dishonest, or that she couldn't be trusted. *Id. at 16*. Mr. Charles also testified that Plaintiff did not direct any specific comments towards Ms. Charles during this conversation. *Id. at 20.*  Nor, according to Mr. Charles, did Plaintiff "berate" or "slam" Ms. Charles during this phone call. *Id. at 31*.

After Plaintiff placed the phone call to Mr. Charles, Mr. Charles called Stephanie Charles, who then reported the phone call to Dave Covell. See *Joint Stipulation ¶35; Covell Depo. Tr. at 38-40; Dave Charles Depo. Tr. 24*. Mr. Covell contacted Mr. Charles at which time Mr. Charles conveyed to Mr. Covell that it was an "annoying phone call." *Dave Charles Depo. Tr. at 24.* According to Mr. Covell, Stephanie Charles "did not go into a lot of detail but kind of felt like it was a retaliatory phone call because it caused a problem with her ex-husband." *Id.*

While Mr. Covell testified that Ms. Charles was "upset," "emotional," and offended" that Plaintiff contacted Mr. Charles, *see Dave Charles Depo. at 17,* Ms. Charles was clearly not affected in her work. Ms. Charles testified that she "felt[12]" it was uncalled for Plaintiff to reach out to her ex-husband on a work related matter and that she "felt" Plaintiff's call was a "personal attack" on her. *Stephanie Charles Depo. at 72-73.*

Thereafter, Plaintiff attended the regularly scheduled January 9, 2013 Board meeting. *See Declaration of Paul Matus, M.D. ¶31; Matus Depo. Tr. at 44; Covell Depo. Tr. at 41.* During the executive session, Mr. Covell reported to the Board that Plaintiff had contacted Dave Charles.

---

[12] It is unclear how Ms. Charles could have "felt" Plaintiff's phone call was a personal attack when Plaintiff made the phone call to attempt to defend himself against rumors that she had reported allegations of sexual harassment. After all, Ms. Charles acknowledged, when asked: "there was really nothing to investigate, correct?" she responded, "I suppose not." *Stephanie Charles Depo. at 42.*

*Covell Depo. Tr. at 41.* Defendant Spreng testified that the Board was only told that Plaintiff had made "disparaging" comments about Ms. Charles to her ex-husband, Mr. Charles. *Spreng Depo. Tr. at 62-63.* However, he was unsure whether anyone had even bothered at this time to ask Plaintiff for his side of what had happened. *Id. at 66.*

Meanwhile, Plaintiff anxiously expected that he would be given an opportunity to address the Board about any allegations that had been made against him. Not knowing that Mrs. Charles reported to Dave Covell that she "felt" Dr. Matus' phone call to Mr. Charles was "uncalled for" or constituted a "personal attack," Plaintiff specifically asked Defendant Covell for the opportunity to speak to the Board. Defendant Covell advised Plaintiff that the Board did not want to be addressed and further explained to him that the Board asked Defendant Covell, a prosecutor and a board member to meet privately and confidentially with Plaintiff where he would finally be told "everything" about the allegations and the investigation. When Plaintiff specifically asked if he needed an attorney, Defendant Covell stated that "there was no need for an attorney" and that the meeting would be private and confidential in his office and it was not intended to be a "legal matter." *See Declaration of Paul Matus, M.D. ¶31; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9. Covell Depo. Tr. at 42-43.*

Defendant Covell testified that he and the Board viewed the call to Mr. Charles as a very serious matter. *Covell Depo. Tr. at 46-50.* Defendant Covell explained that it was discussed during executive session that the phone call was cause for disciplinary action ranging from discharge to a pre-disciplinary hearing and that there was discussion by the Board that if Plaintiff wanted to offer his resignation, then this matter would not become public and the Board would not have to go forward with a show-cause type hearing. *Covell Depo. Tr. at 50-52.*

Subsequently, Plaintiff met privately with Assistant Prosecutor Innes, and Defendants Covell and Spreng on January 11, 2013. *See Joint Exhibit ¶39; Declaration of Paul Matus, M.D. ¶34; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11; Covell Depo. at 54-58.* Assistant Prosecutor Innes led the meeting and claimed to attempt to discuss the "situation" with Plaintiff "more as a friend than as a prosecutor." *See Declaration of Paul Matus, M.D. ¶34.* However, the very first message delivered to Plaintiff by Assistant Prosecutor Innes, and Defendants Covell and Spreng was that the Board had decided to demand his resignation or Plaintiff's employment would be terminated. *See Declaration of Paul Matus, M.D. ¶34; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11; Covell Depo. at 54-58.* Assistant Prosecutor Innes then warned Plaintiff that any termination would become a matter of public record. *Id.* Defendant Covell also reported to Plaintiff that Plaintiff was "through here and he couldn't work with me." *See Declaration of Paul Matus, M.D. ¶34; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.*

During the January 11, 2013 meeting, Assistant Prosecutor Innes claims to have read some of the conclusions set forth in the CNA Memorandum of Investigation but refused to provide a copy of the Memorandum of Investigation after Plaintiff requested it. *See Declaration of Paul Matus, M.D. ¶35; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9; Covell Depo. at 54-58.* Assistant Prosecutor Innes then advised Plaintiff that, although the report concluded that the "complaints did not rise to the level of sexual harassment, there were more serious charges that needed to be addressed." *See Declaration of Paul Matus, M.D. ¶35; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.* Specifically, those charges were that Plaintiff had interfered with an

ongoing investigation, was deceptive to Defendant Covell, and that Plaintiff allegedly "reached into the private life of another employee" who had accused him of "harassment." *See Declaration of Paul Matus, M.D. ¶35 (Matus Declaration).* Without providing Plaintiff with any written summary of the charges and after having already advised him that the Board wanted his resignation, Assistant Prosecutor Innes then asked Plaintiff for his "side of the story." *See Declaration of Paul Matus, M.D. ¶35; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9.*

Without the benefit of having received written charges, and after being advised that the meeting was private and that Plaintiff did not need an attorney, Plaintiff then attempted to "tell his side of the story." *See Declaration of Paul Matus, M.D. ¶36; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11; Covell Depo. at 58.* Plaintiff questioned the underlying allegations, which were still unknown to Plaintiff, and raised his concerns over the fairness of the underlying investigation, the reliability of one woman who may have accused him of inappropriate conduct, and that more serious charges of workplace harassment involving another male Health District employee had not been investigated. *See Declaration of Paul Matus, M.D. ¶36; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11.*

Assistant Prosecutor Innes and Defendants Covell and Spreng characterized these statements, which were offered as Plaintiff's "side of the story" and given at their request, at what was supposed to be a confidential, private meeting, where Plaintiff was discouraged from bringing an attorney, as "threats" made by Plaintiff. *See Declaration of Paul Matus, M.D. ¶37; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11.* Defendant Innes claimed that it was about halfway through this meeting that he put on his

"prosecutor's hat." Defendant Innes stated that he felt Plaintiff's conduct, in allegedly threatening to go public about his complaints against the Board, was almost "criminal." Despite the intentional mischaracterizations of these statements, Plaintiff made no such threats. *See Declaration of Paul Matus, M.D. ¶38.*

Assistant Prosecutor Innes and Defendants Covell and Spreng concluded the January 11, 2013 meeting by advising Plaintiff that he would be given until January 18, 2013 to submit his written resignation or face further public humiliation by being terminated by the Board. *See Declaration of Paul Matus, M.D. ¶39; Plaintiff's Answers to Defendant Health District's Interrogatories, Interrogatory No. 9 and 11; Covell Depo. at 58-60; Spreng Depo. Tr. 69 (*prior to meeting with Plaintiff, the Board discussed that it would "end discussions" if Matus resigned and if he didn't, the Board would consider further reprimands).

Thereafter, on or about January 18, 2013, Plaintiff, through counsel, demanded a fair and full pre-disciplinary hearing in accordance with the Health District's Employee Policy, Section 5.2. *See Declaration of Paul Matus, M.D. ¶40 and Joint Stipulation ¶40, Exhibit 39.* In response, on January 23, 2013, the Board met at a Special Board meeting and immediately adjourned to executive session "for the purpose of considering dismissal or disciplinary action and to discuss the investigation." *See Declaration of Paul Matus, M.D. ¶41 (Matus Declaration) and Joint Stipulation ¶41, Exhibit 40.* Notwithstanding the stated purpose of the executive session, upon information and belief, the members of the Board were not presented with or even asked to review the CNA Memorandum of Investigation. *See Declaration of Paul Matus, M.D. ¶42.*

After the executive session, the Board without conducting any meaningful due diligence of its own, passed four resolutions to proceed with a "'for cause' hearing to dismiss or discipline" Plaintiff, to place Plaintiff on paid administrative leave, and to authorize a contract

with a firm to conduct the hearing regarding Plaintiff, and to cap the contract to conduct a "for cause" hearing at $10,000. *See Declaration of Paul Matus, M.D. ¶43 and Joint Stipulation ¶41, Exhibit 40.* As was the case for all votes taken by the Board, the Board undertook no due diligence of its own. Instead the Board relied solely on the verbal reports of Mr. Covell and the advice of its counsel. *McCullough Depo. Tr. at 59-60.* In fact, Ms. McCullough could not recall a single fact presented to the Board to support any of these resolutions. *McCullough Depo. Tr. at 59-60.*

Thereafter, on February 8, 2013, and in retaliation for Plaintiff's participation in an on-going investigation by "telling his side of the story," Assistant Prosecutor Innes, on behalf of the Health District, prepared a document captioned "Charges supporting 'for cause' measures pursuant to Agreement with Paul Matus Entered July 8, 2009 and pursuant to Lorain County General Health District Employee Personnel Policy," hereinafter the "Charges." These "Charges" became a public record and were thereafter published in local newspapers. *See Declaration of Paul Matus, M.D. ¶43  and Joint Stipulation ¶45, Exhibit 49.*

It is entirely noteworthy to state that the Board of Health has *never* investigated, disciplined, reprimanded or discharged any other employee for *any* of the reasons identified as "charges" as is set forth in the Charges filed against Dr. Matus. *See Defendant Board of Health's Answers to Interrogatories No. 18.*

On February 20, 2013, 40 hours before the Pre-Disciplinary Conference, Plaintiff was finally provided a copy of the CNA Memorandum of Investigation. However, each and every name of each employee interviewed was blackened out. *See Declaration of Paul Matus, M.D. ¶44.*

On February 22, 2013, Plaintiff attended the Pre-Disciplinary Conference. During the Pre-Disciplinary Conference, Plaintiff presented testimony on his behalf. Assistant Prosecutor Innes, Covell and Spreng provided testimony on behalf of the Board. It was not until the day of the Pre-Disciplinary Conference when Plaintiff finally received an un-redacted copy of the CNA Memorandum of Investigation which included the names of the employees who were interviewed. *See Declaration of Paul Matus, M.D. ¶45.*

On March 7, 2013, Plaintiff, through counsel, reported allegations of age discrimination and the creation of a hostile work environment based on the conduct of the investigation and the Pre-Disciplinary Conference which clearly occurred due to "generational differences [which] may exist with the female health educators being in their twenties and [early] thirties and the Medical Director being in his early sixties" and further requested the Health District to undertake an investigation of the hostile work environment so created. *See Declaration of Paul Matus, M.D. ¶46 and Joint Stipulation ¶47, Exhibit 50.* Defendant Health District refused to undertake any investigation of Plaintiff's complaint of age discrimination or concerning the creation of a hostile work environment. *See Declaration of Paul Matus, M.D. ¶47.*

On March 27, 2013, the Pre-Disciplinary Hearing Conference Officer issued his Pre-Disciplinary Conference Findings ("Hatfield Report"). *See Declaration of Paul Matus, M.D. ¶48 and Joint Stipulation ¶47, Exhibit 50.* Plaintiff was exonerated of the most serious charges.  The Hatfield Report states that there is no reasonable cause to believe that Dr. Matus made "false accusations;" there is no reasonable cause to believe that Dr. Matus falsely accused the Board of trying to railroad him, of depriving him of a defense or of violating its own policies; there is no reasonable cause to believe that Dr. Matus eavesdropped or attempted to eavesdrop on an executive session of the District; there is no reasonable cause to believe that Dr. Matus

deceptively represented that he had no knowledge of reports regarding his behavior around female employees; and there is no reasonable cause to believe that Dr. Matus stated that he would not follow an instruction by the District to undergo sensitivity training.

Although Plaintiff was found to have made "derogatory comments about female district staff members" during the January 11, 2013 meeting, those were the same female district staff members which Matus believed had made derogatory comments about him (without being charged with violating any policies of the Health District). Plaintiff denies making any derogatory comments about female staff members. *See Declaration of Paul Matus, M.D. ¶49.*

Further, although Plaintiff was found to have acted "inappropriately" for having called the ex-husband of one of his suspected accusers and by refusing to turn over his only copy of a printout of four or five public twitter posts using foul language and derogatory comments towards older men, no Health District employee has ever been subjected to disciplinary proceedings for calling the ex-husband or spouse of another employee or for refusing to share public records with the Health District employees. *See Declaration of Paul Matus, M.D. ¶50.*

On April 10, 2013, at a regularly scheduled board meeting, Defendant Health District voted to issue a 30-day notice of intent to terminate Plaintiff's Employment Agreement with cause. *See Declaration of Paul Matus, M.D. ¶51 and Joint Stipulation ¶48.* As was the case for all votes taken by the Board, the Board undertook no due diligence of its own. The Board did not review the Hatfield Report, the CNA Report, or the Pearce Letter. *See, Covell Depo. Trans. at 34-35, 75-76; McCullough Depo. Tr. at 57-58, 59-60.* Instead the Board relied solely on the verbal reports of Mr. Covell and the advice of its counsel. *Id.*

As was the case when voting on the resolutions to authorize a pre-disciplinary hearing, Ms. McCullough could not recall a single fact presented to the Board to justify Plaintiff's

termination. *McCullough Depo. Tr. at 57-58.* Mr. Spreng testified that the Board relied on the circumstances of Plaintiff's phone call to Mr. Charles and on the circumstances surrounding the January 11th meeting, which Spreng characterized as "out of control, erratic, and had hurt his standing." *Spreng Depo. Tr. at 73-75.*

On April 12, 2013, Defendant Covell sent a letter to Plaintiff terminating his employment effective May 17, 2013. *Joint Stipulation ¶49, Exhibit 53.* Again, the circumstances of Dr. Matus' termination of his employment has been reported in the local media outlets, with both Dave Covell and Assistant Prosecutor Innes giving statements to the media that Dr. Matus' termination of employment was "with cause."

Since having been publicly terminated by the Health District "with cause," Dr. Matus has suffered emotional distress, including bouts of depression, insomnia, and anxiety. He has been unable to find gainful professional employment commensurate with his prior positions of employment.

Collectively, the Defendants' actions caused Plaintiff to suffer total uncertainty, panic, distress and confusion during the several months that the investigation dragged on; embarrassment brought on him and his family because of this ordeal; and the humiliation of learning about the "investigation" from someone other than the Defendants. He lost income as a result of being terminated from his position as the Medical Director, to which he devoted many years, countless hours and was completely dedicated. He cannot sleep, he has lost weight and has sought counseling to help him deal with the aftermath of this traumatic ordeal.

## LAW AND ARGUMENT

### A.  Plaintiff is Entitled to Judgment for Breach of Contract.

In order to establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a binding contract or agreement; (2) that he performed his contractual obligations; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) he suffered damages as a result of the breach. *Hicks v. Bryan Medical Group, Inc.*, 287 F.Supp.2d 795 (N.D. Ohio 2003); *Lawrence v. Lorain Cty. Community College,* 127 Ohio App.3d 546, 713 N.E.2d 478 (1998) (quoting *Garofalo v. Chicago Title Ins. Co.,* 104 Ohio App.3d 95, 661 N.E.2d 218, 226 (1995)).

There is no dispute that Plaintiff and Defendant Health District entered into an Employment Agreement and that Plaintiff fulfilled all of the terms and conditions thereof. The Employment Agreement contained limited termination rights. Specifically, the Employment Agreement provided:

> This Agreement may be terminated by either party for cause at any time, with thirty (30) days written notice. "Cause" shall mean, but not be limited to breach or neglect of duty, violation of any law, dishonesty, insubordination, or gross misconduct.

In support of its decision to terminate Plaintiff's employment, Defendant Health District claims that Plaintiff engaged in retaliation by contacting the ex-husband of Stephanie Charles. *See Answers of Health District to First Set of Interrogatories, No. 17.* Retaliation is not grounds for termination of Plaintiff's Employment Agreement.

Retaliation so as to affect the work environment, if proven, would constitute a Group III Offense for which termination would be applicable under the Health District's Personnel Policy, Section 5.1, page 55-56. Group III Offenses include:

17.     Intentionally and knowingly engaging in sexual harassment; or interfering with Agency investigations of allegations of sexual harassment; or taking retaliatory action against any employee who reports incidents of sexual harassment; or knowingly and intentionally making false accusations of sexual harassment; or other violations as described in Section 5-7 of this policy manual.

Section 5.7 describes the Health District's policy prohibiting Sexual Harassment. This section states, in relevant part:

An investigation of all complaints of sexual harassment shall be conducted by the Health Commissioner or other persons the Health Commissioner assigned to such task. Every effort shall be made to keep the complaint and the investigation confidential, except as may be reasonably necessary to conduct the investigation. It shall be unlawful, inappropriate and a violation of this policy for any employee who is the subject of a sexual harassment investigation to take retaliatory action **so as to affect the work environment of the complainant or any person involved in the investigation**. (Emphasis supplied.)

In the present case, there is no retaliation under the Employment Agreement, the Health District's policy prohibiting Sexual Harassment or Health District's Personnel Policy, Section 5.1, page 55-56. Group III Offenses. It is beyond dispute that all Plaintiff did was to make a simple phone call to the ex-husband of Stephanie Charles to inquire as to whether Mr. Charles had information about any rumors he may have heard about the so-called investigation. Attempting to defend oneself by gathering information is not (and cannot lawfully be considered) retaliation.

First, an employee who is accused of sexual harassment has a right to participate in an investigation. *See* Ohio Rev. Code Section 4112.02(I). Second, retaliation under the Policies must affect the work environment of the complainant or any person involved in the investigation. Three is no evidence that the work environment of Stephanie Charles was affected by Plaintiff's phone call to her ex-husband. Nor is there any evidence that Plaintiff's phone call interfered with

33

an on-going investigation. It is undisputed that the investigation was over. Even if it were not, there was no evidence of interference.

At the time that Plaintiff placed the phone call to Mr. Charles, he had no personal, firsthand knowledge or confirmation that Stephanie Charles made any allegations about him. Instead, Plaintiff based his decision to contact Mr. Charles on what he perceived to be a previous personal relationship he had with Mr. Charles and his father as well as the rumors and innuendo being discussed throughout the Health District. By placing the call to Mr. Charles, Plaintiff was attempting to gain information in order to be prepared to address the Board. *Matus Declaration ¶53.* At no time did Plaintiff interfere or attempt to interfere with an investigation of sexual harassment. *Matus Declaration ¶54.* At no time did Plaintiff retaliate or attempt to retaliate against anyone who made a complaint or report of sexual harassment. *Matus Declaration ¶55.*

More importantly, however, according to the Defendants, the underlying "investigation" was completed before Plaintiff contacted Mr. Charles.[13] Defendants' timeline fluctuates depending on which argument they are attempting to support.

Under Ohio law, the purpose of contract construction is to "ascertain and give effect to the intent of the parties." *Mansfield Plumbing Products LLC v. Mariner Partners, Inc.*, 300 F.Supp.2d 540 (N.D. Ohio 2004); *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361 (1997); *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313 (1996). The intent of the parties is presumed to reside in the language they choose to use in their written agreement. *Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130, paragraph one of the syllabus, (1987). In construing a contract under Ohio law, the instrument should be read as a whole with the intent of each part gathered from a consideration of the whole. *Foster Wheeler,* 78 Ohio St.3d at 361-62. Where the terms of a contract are clear and

---

[13] *See Spreng Depo. Tr. at 54; von Hofen Depo. Tr. at 84-85; Covell Depo. Tr. at 33.*

unambiguous, the court cannot find different intent from that expressed in the contract. *E.S. Preston Assoc., Inc. v. Preston,* 24 Ohio St.3d 7, 10. If there is no ambiguity in the language of a contract, the court should not interpret words beyond their plain meaning or rewrite the contract to provide for a more equitable result. *Werner v. Cincinnati Ins. Co.,* 77 Ohio App.3d 232, 235 (1991); *Foster Wheeler,* 78 Ohio St.3d at 362. Common words in a contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is apparent from the face or overall contents of the document. *Alexander v. Buckeye Pipe Line Co.,* 53 Ohio St.2d 241 paragraph two of the syllabus, (1978).

Defendants may argue that the Board determined, in exercising its "discretion," that Plaintiff's phone call was an act of retaliation. This argument would lack merit. Instead, the fact that the Employment Agreement did not give the Board discretion to make this decision would only serve to underscore Plaintiff's position. *C.f. Teagardin v. Metal Foils*, 2003-Ohio-2102, 2001L235, 03-LW-1581 (11th) (holding that the employer's decision with regard to an employee's malfeasance or nonfeasance is conclusive where the employment agreement specifically provides, "However, appellant could be terminated for cause for "malfeasance or nonfeasance or breach by [appellant] in the performance of [his] duties, as determined by the Board ***.") Here, the Employment Agreement does not give the Board discretion in making this determination. In other words, there must be conclusive evidence, reasonable and rational evidence of retaliation and no such evidence exits herein.

Because Plaintiff's Employment Contract was not terminated in accordance with the four corners of the agreement, Defendant Health District is in breach of the Agreement and Plaintiff is entitled to recover damages.

### 1.    Plaintiff's Agreement Is Enforceable

Citing to Ohio Revised Code section 124.11(A)(24) and *Davidson v. Sheffield-Sheffield Lake Bd. Of Edu,* 90-LW-1731 (Ohio App. 9th Dist. 1990), Defendant Health District now claims that the contract it drafted and provided to Plaintiff, which he executed and fully relied upon during the course of his employment, is void and unenforceable because he is an unclassified civil servant. Defendant's reliance on R.C. 124.11(A)(24) and *Davidson, supra* is misplaced and, therefore, this argument lacks merit.

O.R.C. 124.11(A)(24) does not apply to Plaintiff. That section provides that unclassified civil servants of general health districts (among others) shall be exempt from all examinations required by chapter 124. Those employees include "the deputies and assistants of elective or principal executive officers authorized to act for and in the place of their principals or holding a fiduciary relation to their principals." Plaintiff is not a deputy or assistant of an elective or principal executive officer. Plaintiff is appointed by the Board of Health and reports directly to its directors, not the executive or principal officer. Plaintiff is neither a classified or unclassified employee of the Board of Health.

Instead, Plaintiff is employed pursuant to R.C. 3709.11:

Within thirty days after the appointment of the members of the board of health in a general health district, they shall organize by selecting one of the members as president and another member as president pro tempore. The board shall appoint a health commissioner upon such terms, and for such period of time, not exceeding five years, as may be prescribed by the board. The person appointed as commissioner shall be a licensed physician, licensed dentist, a licensed veterinarian, licensed podiatrist, licensed chiropractor, or the holder of a master's degree in public health or an equivalent master's degree in a related health field as determined by the members of the board of health in a general health district. He shall be secretary of the board, and shall devote such time to the duties of his office as may be fixed by contract with the board. Notice of such appointment shall be filed with the director of health. The commissioner shall be the executive

36

officer of the board and shall carry out all orders of the board and of the department of health. He shall be charged with the enforcement of all sanitary laws and regulations in the district. The commissioner shall keep the public informed in regard to all matters affecting the health of the district. <u>When the commissioner is not a physician, the board shall provide for adequate medical direction of all personal health and nursing services by the employment of a licensed physician as medical director on either a full-time or part-time basis. The medical director shall be responsible to the board of health</u>.
(Emphasis provided.)

Thus, there is nothing in R.C. 3709.11 which limits the discretion of the Board in employing a medical director for a "continuing and indefinite" term as was done in Plaintiff's contract. "The determination of whether employees shall be classified or unclassified is a legislative function, and cannot be circumvented by executive or administrative actions." *Davidson, supra*. In Plaintiff's case, the legislature determined that the medical director "shall be responsible to the board of health" and not any elected officials or the executive director. The legislature, therefore, took Plaintiff's position of employment as the medical director outside of the unclassified civil service and provided the board of health with discretion to determine the contractual arrangements for medical director's employment.

Plaintiff's employment agreement is therefore enforceable.

### B. <u>Plaintiff is Entitled to Judgment for Breach of Implied Duty of Good Faith and Fair Dealing</u>.

Defendant Health District breached the implied duty of good faith and fair dealing in commencing and conducting the so-called investigation, by failing to notify Plaintiff of the sexual harassment investigation, failing to undertake the investigation in a reasonable fashion, and in discharging Plaintiff in retaliation for his participation in an investigation and proceeding, which, according to Defendants Spreng, von Hofen & Covell, had concluded prior to Plaintiff's allegedly retaliating contact.

Ohio Courts do not generally recognize a good faith and fair dealing claim separate from a breach of contract claim. *Carlquist v. Wells Fargo Bank, N.A.*, 1:12 CV 0203. However, Ohio courts recognize that to the extent breach of the implied covenant is actionable, it is part and parcel of *a breach of contract* claim and does not exist as its own stand-alone claim for relief. *See Mathiew Frisch v. Nationwide Insurance Company*, No. 2:12-cv-415 (U.S. Dist. Ct., S.D. Ohio November 15, 2012); citing *Wauseon Plaza, Ltd. v. Wauseon Hardware Co.,* 156 Ohio App.3d 575, 2004-Ohio-1661, 807 N.E.2d 953, ¶ 52; *Lakota Loc. Sch. Dist. Bd. of Edn.,* 108 Ohio App.3d 637, 646, 671 N.E.2d 578 (Ohio Ct. App. 1996); *see also McCubbins v. BAC Home Loans Servicing, L.P.,* No. 2:11-cv-547, 2012 U.S. Dist. LEXIS 5620, at *14 (S.D. Ohio Jan. 18, 2012). A party *may* maintain a *breach of contract* claim when the term allegedly breached is the implied duty of good faith and fair dealing. *Eggert Agency, Inc. v. NA Mgmt. Corp.,* No. 2:07-cv-1011, 2008 U.S. Dist. LEXIS 90830, at *11 (S.D. Ohio Aug. 12, 2008). Bad faith is merely one form of breach which may allow for extra remedies. *Bryan v. Bank of America Home Loan Servicing,* No. 3:10 CV 959, (U.S. Dist. Ct., N.D. Ohio, 2011).

It is well-recognized that every contract contains an implied duty of good faith and fair dealing. E.g., *O'Brien v. Ravenswood Apts., Ltd*, 169 Ohio App.3d 233, 2006-Ohio-5264, 862 N.E.2d 549, ¶ 36; *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 27. In *Littlejohn*, the court described the duty as follows: "'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' * * * [B]ad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Id*. at ¶ 26, quoting Restatement of the Law 2d, Contracts (1981), Section 205, Comments a and d. "Generally, a breach of contract occurs when a party

demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." (Internal citation omitted.) *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 108, 661 N.E.2d 218. However, the covenant is limited in scope and cannot create rights and duties not otherwise provided for in the contract. *Lawarre v. Fifth Third Sees.*, 1st Dist. No. C-110302, 2012-Ohio-4016, ¶ 35, citing *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957 (2004).

It is clear that Ms. Charles did not want to report the alleged incident for numerous reasons and, in fact, agreed that no investigation was even warranted in the first place. First, Ms. Charles publicly referred to herself as a "drama queen," who was married but has since divorced, during which times she was and is involved in a personal relationship with a male Health District staff member, Raymond Romero. Second, Raymond Romero was the subject of several complaints of workplace harassment reported directly to Defendant Pearce. Third, Defendant Pearce failed and/or refused to take any remedial steps against the Raymond Romero to correct the workplace harassment. Fourth, the alleged incident as reported by Ms. Charles had taken place 16 to 17 months earlier, in March or April of 2011, and Ms. Charles reported no further personal "uncomfortable" experiences with Plaintiff.  Fifth, the allegations were not truthful, or, at the very least, were greatly exaggerated so as to give the claims some semblance of validity.

In undertaking the investigation, Defendant Health District failed and refused to proceed with the investigation in a reasonable fashion and by violating essentially every standard and common practice, procedure and guideline readily and easily available to human resource professionals, management consulting firms and legal professionals. The most common and

accepted standards, practices, procedures and guidelines are available on-line and published by the United States Equal Employment Opportunity Commission (the "EEOC").

There is no dispute that the Defendant Health District, through any of its employees, agents or representatives, including CNA, at any time during the course of the investigation, **ever** bothered to advise Plaintiff that: Stephanie Charles allegedly reported to Defendant Pearce on or about August 6, 2012 an incident which took place in March or April of 2011; Mr. Pearce verbally reported to Ben Davey that he had received a report from Stephanie Charles; Mr. Pearce provided Ben Davey a letter purporting to summarize his conversation with Stephanie Charles about Plaintiff; the Board of Health had voted to authorize a contract with CNA to conduct an investigation wherein Plaintiff was the subject of a sexual harassment complaint; CNA was undertaking interviews with Health District employees including Stephanie Charles; Plaintiff should refrain from taking any action which might be considered retaliatory against Stephanie Charles; Plaintiff should refrain from taking any action which might be considered to interfere with the investigation; Plaintiff would be the subject of disciplinary proceedings up to and including termination of his employment in the event that he took any type of retaliatory action against anyone who may be interviewed during the investigation; Plaintiff would be the subject of disciplinary proceedings up to and including termination of his employment in the event that he took any type of action that might be considered to interfere with the investigation; Plaintiff would be interviewed and afforded an opportunity to tell his side of the story before any report of the investigation would be made; Plaintiff that the CNA investigation had concluded and that a report had been issued on December 13, 2012;

Instead, it is entirely undisputed that Plaintiff was never advised that he was the subject of a sexual harassment investigation and he was never given the opportunity to respond to the

40

allegations being made against him, even when he asked pointed and direct questions to the Board of Health's attorney, Assistant Prosecutor Innes, and to the Health Commissioner, Defendant Covell, and to the administrative assistant, Joyce Davis. Rather, both Mr. Innes and Mr. Covell affirmatively and actively refused to provide Plaintiff with relevant and pertinent information. Moreover, Defendant Covell advised Plaintiff that he would be given an opportunity to address the Board once a report was given to the Board.

To make matters worse, when Plaintiff attempted to gather information by placing a phone call to Dave Charles, Defendants used that information to bait Plaintiff into attending a meeting with Defendants Covell, Spreng and Assistant Prosecutor Innes. At that time, Defendant Covell advised Plaintiff that the meeting would be private and confidential, that Plaintiff did not need an attorney present, and that Plaintiff would be told everything and be given an opportunity to respond. Defendant Covell failed to advise Plaintiff before the meeting that the Board was considering terminating Plaintiff's employment, discipline or a pre-disciplinary hearing in the event that Plaintiff refused to give his resignation.

### C.  Plaintiff Is Entitled to Judgment on His Claim for Retaliation Pursuant to Ohio Revised Code Section 4112.02(I).

Under Ohio Revised Code § 4112.02(I):

It shall be an unlawful discriminatory practice:

***

(I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code. (Emphasis supplied).

To establish a *prima facie* case of unlawful retaliation under Title VII, the employee must present by a preponderance of evidence that: (1) the employee was engaged in a protected

41

activity; (2) the employer knew that the employee was engaged in this protected activity; (3) the employer subsequently took an employment action adverse to the employee; and (4) a causal connection between the protected activity and the adverse employment action exists. *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir. 2003) (citing *Strouss,* 250 F.3d at 342 (6th Cir. 2001); *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000)). The Sixth Circuit has held after the plaintiff has proven the existence of a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Abbott,* 348 F.3d at 542 (citing *Nguyen,* 229 F.3d at 562). If the defendant can meet this burden, then the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's proffered reason was mere pretext. *Abbott,* 348 F.3d at 542 (citing *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994)). If the plaintiff demonstrates that the defendant's proffered reasons were pretextual, then the fact finder may infer unlawful retaliation. *Abbott,* 348 F.3d at 542.

After having been advised that a sexual harassment investigation[14] was underway, Plaintiff participated in the investigation during his attendance at the January 11, 2013 meeting. As a result of Plaintiff's participation in the investigation, Defendants charged Plaintiff with further false and frivolous allegations of wrongful conduct. Plaintiff's participation in the phone

---

[14] Plaintiff acknowledges *Abbott v. Crown Motor Company, Inc.,* 348 F.3d 537 (6th Cir. 2003) in which the Sixth Circuit Court of Appeals, in interpreting Title VII held that "Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge, and that there is no evidence that an EEOC or OCRC charge was pending. Plaintiff also acknowledges the line of federal court of appeals cases which hold that participation in an internal investigation not connected with a formal EEOC proceeding does not qualify as protected activity under Title VII's participation clause. *See, e.g., Townsend v. Benjamin Enterprises, Inc.,* 679 F.3d 41, 49 (2nd Cir. 2012). However, if the Ohio legislature had intended the participation clause to pertain to only investigations, proceedings or hearings conducted by the Ohio Civil Rights Commission, it could have done so clearly enough by using the term "investigations, proceedings or hearings conducted by the Commission." The "Commission" is defined by R.C. 4112.01(A)(6). Investigation, proceeding and hearing is not defined and, therefore, must be construed liberally for accomplishment of the purposes set forth in those sections. R.C. 4112.08.

call to Dave Charles and at the January 11th meeting was a determining factor of adverse employment actions. As a direct and proximate result of Defendant's retaliation against Plaintiff based on his participation in the investigation, Plaintiff has suffered damages.

Participation of any kind in an investigation must be the "determining factor" in the adverse employment action. *Cleveland Civil Service Comm. v. Ohio Civil Rights Comm.* (1991), 57 Ohio St.3d 62; *Plumbers & Steamfitters v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 198-199. See also *St. Mary's Honor Center v. Hicks* (1993), 509 U.S. 502 (the action complained of must be done because of intentional discrimination). In the present case, Plaintiff participated in an investigation by attempting to gather information in order to prepare himself to discuss the matter with the Board.

There should be no doubt that the anti-retaliation provisions provide protection for those who participate in any manner with an investigation, including the individual who is the subject of the investigation. *See, e.g., Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1186-87 (11th Cir. 1997) and *Deravin v. Kerik,* 335 F.3d 195, 204 (2nd Cir. 2003) ("We accordingly hold that defending oneself against charges of discrimination – to the extent that such defense involves actual participation in a Title VII proceeding or investigation – is protected activity within the scope of §704(a) based on the plain reading of the statute's text.")

Just as the Court of Appeals concluded in *Merrit* and *Deravin,* this Court should likewise conclude that Plaintiff's participation in the investigation, by interviewing a person he believed might be able to provide facts to support his position and/or who might be a witness in his favor, protected him against unlawful retaliation. There is no dispute that one of the main reasons for Plaintiff's termination was his phone call to Dave Charles, who he believed might provide him with information in his defense of the alleged sexual harassment investigation.

It was at this meeting that Defendants Spreng and Covell advised Plaintiff that his employment would be publicly terminated unless he agreed to resign. Plaintiff refused to resign under the cloud of a sexual harassment investigation hanging over him. Indeed, as a well-respected member of the medical and local community, Plaintiff was deeply concerned about his reputation as a physician as well as the Medical Director.

### D.     Plaintiff is Entitled to Compensatory and Punitive Damages

A plaintiff who has succeeded under a claim for retaliation is entitled to compensatory and punitive damages pursuant to R.C. 4112.99 ("Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief.")  Compensatory damages include back pay and front pay. *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 246. While the damages must be proven with reasonable certainty, the employee is not required to prove with unrealistic precision the amount of lost earnings, if any, due him/her. Any uncertainties in the amount employee could have earned should be resolved against the employer. *Ohio Civil Rights Comm. v. Ingram*, 69 Ohio St.3d 89, 1994-Ohio-515.

Compensatory damages generally include direct pecuniary loss, such as hospital and other medical expenses immediately resulting from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering. *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 320, 2000-Ohio-61 (Ohio App. 10 Dist. 1999), citing 4 Restatement of the Law 2d, Torts (1965) 453, Section 903 *et seq.* In an employment case, in addressing damages, the trial court should instruct the jury[15] that "they could award plaintiff compensatory damages including pain and

---

[15] Ohio Jury Instructions 533.25 states:
> In determining the amount of compensatory damages the jury may consider the nature, character, seriousness and duration of any (emotional pain) (suffering) (inconvenience) (mental anguish) (loss of enjoyment of life) the employee may have experienced.

suffering and mental anguish, future damages including loss of future earnings, and back pay." *Id.*

Punitive damages may be available upon a showing of actual malice. *Rice v. Certainteed Corp.*, 84 Ohio St.3d 417, 1999-Ohio-361. Plaintiff is entitled to compensatory and punitive damages[16]. *Russ v. TRW, Inc.*, 570 N.E.2d 1076, 59 Ohio St.3d 42 (Ohio 1991). An "award of punitive damages based on conscious disregard malice requires 'a positive element of conscious wrongdoing. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by [its] behavior.'" *Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1242, 1247-48 (Ohio 1996). As to the defendant's state of mind, "actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross." *Villella v. Waikem Motors, Inc.*, 543 N.E.2d 464, 466-67 (Ohio 1989).

Under Ohio law, punitive damages may be awarded only upon a finding of actual malice, fraud, or insult on the part of the defendant. R.C. § 2315.21; *see Estate of Beavers v. Knapp*, 175 Ohio App.3d 758 (2008). For punitive damages to be appropriate, "something more than mere negligence is always required." *Id.* at 335. Substantial harm must be a near certain consequence of the defendant's actions. *See Motorists Mut. Inc. Co. v. Said*, 63 Ohio St.3d 690 (1992). "Any less callous mental state is insufficient to incur that level of societal outrage necessary to justify an award of punitive damages. Therefore, it is evident that a reckless actor, who only has knowledge of the mere possibility that his or her actions may result in substantial harm, is not

---

[16] The procedures of Ohio Rev. Code 2315.21 requiring bifurcation of compensatory and punitive damages claims does not apply in federal courts. *Wolkosky v. 21st Century Centennial Ins. Co.*, 2:10-cv-439; *Patel Family Trust v. Amco Insurance Co.*, 2:11-cv-1003; *Piskura v. Taser International, Inc.*, 1:10-cv-248-HJW.

behaving maliciously." *Kuebler v. Gemini Transp.*, 2013 WL 6410608, *5 (S.D. Ohio) (quoting *Motorists Mut. Inc.,* 63 Ohio St.3d 690).

Because R.C. § 2315.21 does not define malice, the Supreme Court of Ohio applies the definition of actual malice set forth in *Preston v. Murty,* 32 Ohio St.3d 334 (1987), to punitive-damage claims. *Malone v. Courtyard by Marriott Ltd. Partnership*, 74 Ohio St.3d 440 (1996). Thus, for purposes of punitive damages, malice is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston*, 32 Ohio St.3d at 334. A party seeking punitive damages bears the burden of proving malice with clear and convincing evidence. R.C. § 2315.21(D)(1)(4).

Punitive damages can be awarded against an employer where either (1) the employer's actions directly demonstrated malice or fraud, or (2) the employer authorized, participated in, or ratified such actions by its employee. Ohio Rev. Code § 2315.21(C)(1).

In addition, attorney fees can be awarded as a component of attorney fees. Although a litigant does not have a constitutional right to a trial by jury as to the determination of whether, or in what amount, attorney fees should be awarded in a tort action, "a trial court must submit to a jury [as a matter of public policy] the issue of whether attorney fees should be awarded in a tort action. The amount of those fees, however, shall be determined by the trial judge who may, in his or her discretion, submit the question of the amount of fees to the jury." *Digital & Analog Design Corp. v. North Supply Co.* (1992), 63 Ohio St.3d 657, paragraphs two and three of the syllabus.

In the present case, the evidence will show the Health District engaged in actual malice and authorized, participated and ratified the actions of its employees, agents and other representatives.

### CONCLUSION

Based on the foregoing, Plaintiff expects full and complete compensation for the wrongs committed against him including compensatory and punitive damages and attorney fees.

Respectfully submitted,


/s/ David M. Cuppage
David M. Cuppage (0047104)
dmcupp@climacolaw.com
Margaret M. Metzinger (0065624)
mmmetz@climacolaw.com
**CLIMACO, WILCOX, PECA,**
**TARANTINO & GAROFOLI CO., L.P.A.**
55 Public Square, Suite 1950
Cleveland, Ohio  44113
Telephone:  (216) 621-8484
Facsimile:   (216) 771-1632

*Attorneys for Plaintiff Paul Matus*

## **APPENDIX**

A.  Witness List;

B.  Exhibit List;

C.  Proposed Voir Dire Questions;

D.  Proposed Jury Instructions.

**CERTIFICATE OF SERVICE**

The foregoing was electronically filed this <u>20</u><sup>th</sup> day of April 2016.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ David M. Cuppage*　　　　　　　　
David M. Cuppage

*One of the Attorneys for Plaintiff*

49